128 P.3d 795

**STATE of Hawai'i, Plaintiff–Appellant**

v.

**Rodney JOSEPH, Jr., Defendant–Appellee**

and

**Ethan Motta and Kevin Gonsalves, Defendants.**

No. 27001.

Supreme Court of Hawai'i.

Jan. 31, 2006.

Reconsideration Denied Feb. 17, 2006.

James M. Anderson, Deputy Prosecuting Attorney, City & County of Honolulu, on the briefs, for plaintiff-appellant.

Reginald P. Minn, on the briefs, Honolulu, for defendant-appellee.

Samuel P. King, Jr., on the briefs, Honolulu, for Party–in–Interest Christopher Evans.

MOON, C.J., ACOBA, J., and Intermediate Court of Appeals Associate Judge WATANABE, in place of DUFFY, J., recused; with NAKAYAMA, J., concurring separately and dissenting, with whom LEVINSON, J., joins.

Opinion of the Court by ACOBA, J.

We hold in this appeal by Plaintiff–Appellant State of Hawai'i (the prosecution) that (1) the statement obtained from Defendant–Appellee Rodney Joseph, Jr. (Joseph) was obtained in violation of Joseph's right to remain silent, and (2) the statement made after Joseph had been given his *Miranda* rights and any evidence resulting from such statements are inadmissible as the fruit of the first statement. Therefore, the November 4, 2004 Order Granting [Joseph's] Motion to

Suppress Statement and Evidence (the order) issued by the circuit court of the first circuit [1] (the court) is affirmed.

## I.

### A.

This case arises from a shooting which occurred during the early afternoon of January 7, 2004 at the Pali Golf Course when two men were killed and a third man was injured. Joseph learned that the police were looking for him in connection with the shooting incident. Attorney Christopher Evans (defense counsel) represented Joseph. On the advice of his mother and defense counsel, Joseph voluntarily surrendered to police at approximately 5:45 P.M. that same evening. He was arrested and detained at the Beretania Street Station of the Honolulu Police Department (the police station). That evening, at approximately 9:00 or 10:00 P.M., Joseph and defense counsel met at the police station while Joseph was in custody.

### B.

On January 8, 2004, defense counsel telephoned Detective Kathleen Osmond (Detective Osmond) of the Honolulu Police Department and told her that Joseph wished to make a statement. During these events, defense counsel was suffering from a broken left wrist. He had broken his wrist either on New Year's eve or day. His wrist was in a cast and he was taking either Vicodin or Tylenol Extra–Strength for pain. That evening, defense counsel arrived at the police station and Joseph was brought up from his cell by Detective Larry Tamashiro (Detective Tamashiro). Defense counsel and Joseph had a private meeting in a police interrogation room that lasted approximately twenty to twenty-five minutes. The prosecution asserts that, during this meeting, defense counsel and Joseph discussed the facts of the case. Although not specifically disputing the prosecution's position, Joseph notes that no testimony was taken as to what was discussed during this meeting. Shortly after that meeting, defense counsel told Detectives Osmond and Tamashiro that Joseph was ready to give his statement.

Detectives Osmond and Tamashiro then entered the room where Joseph and defense counsel had been speaking privately and the parties "entered into a pre-interview discussion" (the pre-interview). Prior to entering the room, Detective Osmond turned on video recording equipment to record the interview. The transcript of the pre-interview is as follows:

[DEFENSE COUNSEL]: ... and if you want, if you want to start with asking the questions, please do so, or if you want [Joseph] to start to tell you what the situation was in terms of how this thing came about, we can do that. What's your preference?

DETECTIVE OSMOND: Ah, I don't ——

[DEFENSE COUNSEL]: Or I can do an offer of proof. Here's the offer of proof, okay? Yeah, it's a gambling situation, right, he was in charge of the houses, okay and Lapu (spelled phonetically) felt that his toes were being stepped on. So, Lapu got his boys together and started putting the word out they're gonna get 'em. That was a couple of days before the thing at the Pali, right?

And so when he, when he went to the Pali, got the black Ford Explorer, I can give you the vehicle if you want it, but just let me know that whoever brings it down can drop it off and leave.

DETECTIVE OSMOND: Um, umm.

[DEFENSE COUNSEL]: He had a gun, a 38. No, a 3, 3–80 ——

MR. JOSEPH: 3–80 (indiscernible).

[DEFENSE COUNSEL]: 3–80, okay. He was the driver. He was wedged between the, what you call, the door and the seat facing the bluff on the upper parking lot. Malu was on the other side, had a gun, and he heard a pop. He (indiscernible) down, got down on the side of the V, reached into his seat, got the gun, pulled the gun up and started shooting up towards the bluff where he thought the guys were.

1. The Honorable Michael A. Town presided.

MR. JOSEPH: Towards the house.

[DEFENSE COUNSEL]: The bluff or the clubhouse?

MR. JOSEPH: *The car was into the bluff like this, and the door was open like this.*

[DEFENSE COUNSEL]: *Right, right, you shooting up the bluff or* ——

MR. JOSEPH: *No, I'm leaning my back into the vehicle.*

DETECTIVE OSMOND: *So, he's leaning with his back against the bluff.*

MR. JOSEPH: *Yeah, yeah.*

[DEFENSE COUNSEL]: Okay. And then what direction do you shoot when you shoot?

MR. JOSEPH: Towards down the house.

[DEFENSE COUNSEL]: The clubhouse.

MR. JOSEPH: Towards that way, yes.

[DEFENSE COUNSEL]: Okay. And then you fire, shoot a few rounds, you stayed by the truck.

MR. JOSEPH: I stayed by the car, yeah.

[DEFENSE COUNSEL]: And then you heard Malu, shots from his side?

MR. JOSEPH: I heard the shot first.

[DEFENSE COUNSEL]: Okay.

MR. JOSEPH: At first, I was sitting in the door like this and they surround the car like that, so had couple guys on this side and I was watching these guys on this side. And, then like they was going make one move to me, so I back into the door like this and then I went pow on this side. So, I had drop down on the ground like this in the middle of the V and that's when I wen grab the gun and wen blank out, and I just started shooting up like this, like that.

And when I kine'a wen focus (indiscernible) you know, I wen kine'a phase-out, that's wen neva had nobody, everybody was gone from the area ova dea. I neva see nobody, and then I heard Malu, cuz, cuz. I said what happened, what happened, Malu, you okay? Then I started looking if I had, you know, I got shot or

what, and I got in the car (indiscernible) dropped him off at, back at the funeral.

[DEFENSE COUNSEL]: The gun he got from somebody, he's trying to recollect the name, okay, that he bought the gun.

MR. JOSEPH: (indiscernible) long time ago.

[DEFENSE COUNSEL]: Got the gun?

MR. JOSEPH: Yeah.

[DEFENSE COUNSEL]: Okay. He destroyed it after the shooting and he can tell you who he went to to destroy it, burned it, you know, torched it, right? That's what we got. I mean, so, you know ——

DETECTIVE TAMASHIRO: Okay, well anyway, what we're gonna do is we're just gonna ——

MR. JOSEPH: (indiscernible)

DETECTIVE TAMASHIRO: Right.

[DEFENSE COUNSEL]: It's background, I mean all this stuff is just background.

DETECTIVE TAMASHIRO: *No, we realize that, but she'll just start and we'll just go from there.*

DETECTIVE OSMOND: *Okay. Yeah, what I'm gonna do is* ——

[DEFENSE COUNSEL]: Yeah, okay. You're (indiscernible) they wanna get something on the record.

DETECTIVE OSMOND: *Yeah, we have to because nothing, nothing here counts. It's just us talking story.*

DETECTIVE TAMASHIRO: Without, without being ——

[DEFENSE COUNSEL]: The reason why I wanted you to get a little bit of this now . . . .

DETECTIVE OSMOND: Um, umm.

[DEFENSE COUNSEL]: . . . okay, is that hopefully if you have information that would suggest that there might be something other, something else there, you could tell us right now. Say, Rodney, you know, give me a break, but, well ——

DETECTIVE OSMOND: Well, I, I ——

[DEFENSE COUNSEL]: Now, see, the upper parking lot, see, I know the Pali

Golf Course pretty well. The upper parking lot down to the clubhouse, they got one skinny, wooden staircase right in the middle of that, that slot thing, you know (indiscernible), and you miss that staircase, you don't go down the staircase, you gotta go all the way around the road, I mean, you know, to get to the clubhouse, right. So, you know, when the clubhouse pro shop owner says that oh, yeah, he seen a guy chasing a guy or whatevers to the front of the clubhouse and then shooting (indiscernible). Oh, whatevers, okay.

MR. JOSEPH: (indiscernible)

[DEFENSE COUNSEL]: Huh?

MR. JOSEPH: That, you know, that I can work with you guys (indiscernible).

DETECTIVE TAMASHIRO: Well, I'll tell you what, the bottom line is your attorney's here, you decide. Only you can decide whether you wanna talk to (indiscernible). I'm sure he's—well, he's talked to you for a while. It's up to you whether you wanna talk to us or not.

MR. JOSEPH: I wanna cooperate.

[DEFENSE COUNSEL]: Good, and I would recommend you do that.

DETECTIVE TAMASHIRO: *But, you know, like Kathy said, we gotta have it on record.*

[DEFENSE COUNSEL]: See, what they're gonna have to do, they're gonna have to get something on the record at some point in time cause the first thing the prosecutor's gonna ask them.

DETECTIVE OSMOND: *Oh, yeah, cause nothing that goes before this is worth anything.*

DETECTIVE TAMASHIRO: *Doesn't mean anything. That's just to protect you too anyway. That's why we put it on record.*

MR. JOSEPH: Okay. *I mean (indiscernible) get any, like, deals or something (indiscernible).*

DETECTIVE TAMASHIRO: *Well, as far as that we, we can't promise you anything. Everything that we do has to go through the prosecutor's office. We present our case, this is what we have, and*

*they'll work with your attorney if there's any deals to be made.*

[DEFENSE COUNSEL]: There's a possibility there is, I wouldn't be here telling you there was if there wasn't, but there is, okay, and it would include the whole range of things. Like I said, custody if that is required for you and your family. Perhaps bail consideration's down the road if that's not a concern. Possible sentencing agreements, okay, but there's a whole host of things that they can look at, Rodney.

DETECTIVE OSMOND: *But we, Tamashiro and myself are not of the position or ability to make any sort of promises*

DETECTIVE TAMASHIRO: And I wouldn't bullshit you (indiscernible) I promise you that ——

[DEFENSE COUNSEL]: Well, see, what the prosecutor is gonna ask these two fine individuals is what do you think (indiscernible) cooperate (indiscernible).

DETECTIVE TAMASHIRO: And the thing is, you know, whatever deal they make, it's gonna be a formal ——

DETECTIVE OSMOND: Yea, it won't just be a shake hands.

DETECTIVE TAMASHIRO: No, it will be formal with your attorney.

DETECTIVE OSMOND: *It will be in writing, and everything will be written down and, of course, you have certain things going for you cause you did turn yourself in. You did call. . . .*

[DEFENSE COUNSEL]: Correct.

DETECTIVE OSMOND: *. . . come in, and you know, there's always a plus* (indiscernible).

[DEFENSE COUNSEL]: And we get the vehicle.

DETECTIVE OSMOND: Okay. So ——

DETECTIVE TAMASHIRO: *And understand this, if it works, the thing is, we're gonna ask you if you take polygraph in reference to your statement.*

[DEFENSE COUNSEL]: Correct.

DETECTIVE TAMASHIRO: *Because we give you the polygraph test and if you*

*fail, that's it.* We're not gonna, even, you know, even if you said you know what, I lied on this point, we're not gonna bother giving you another polygraph test.

DETECTIVE OSMOND: No, the time is (indiscernible) consideration.

DETECTIVE TAMASHIRO: So, all I can say is should you decide to talk to us, you just tell us the truth?

[DEFENSE COUNSEL]: And you guys keep it to your vest (indiscernible) they keep it to their vest.

DETECTIVE OSMOND: *Yeah, we're not gonna (indiscernible).*

[DEFENSE COUNSEL]: So far, they've done a very good job of handling the immense calls that's been coming in. They've been flooded with calls, the news media. Jim Dooley in particular, Jesus, he's gonna run a story about your background.

DETECTIVE OSMOND: *Yeah, we don't talk to anybody.* The only people we would talk to about this case is when we confer with the prosecutors. Obviously they have to know.

DETECTIVE TAMASHIRO: *And it serves us no purpose to talk to the (indiscernible)*

DETECTIVE OSMOND: *No, absolutely not.*

[DEFENSE COUNSEL]: Yeah. *So, they're not gonna, you know, in other words, if you give a statement, that ain't coming out, okay. That's gonna be held close to the vest for quite some time, until such time as, you know, it becomes manifest that it has to be disclosed.*

DETECTIVE OSMOND: *Sure, obviously when it goes to court that this is gonna come out, there's no doubt about that. But, up until then, we're not gonna say anything (indiscernible) prosecutor's office.*

[DEFENSE COUNSEL]: Ok-ee dokee.

DETECTIVE OSMOND: *Alright, so what I have here is a constitutional rights form. Well, before we get started.*

[DEFENSE COUNSEL]: Gotta go over this form.

DETECTIVE OSMOND: Yeah, we're gonna do a ——

[DEFENSE COUNSEL]: (indiscernible) sign it.

(Emphases added.) This pre-interview lasted approximately twenty-two minutes.

After the pre-interview, a formal interview was conducted (the post-*Miranda* interview), which was audiotaped by Detective Osmond. Joseph was asked a few background questions by Detective Osmond, was given the Honolulu Police Department Form 81,[2] and was then advised of his *Miranda* rights. Joseph was questioned by both detectives and provided a statement lasting approximately one hour and twenty minutes.

The parties agree that defense counsel had not spoken with any prosecutor or police detective prior to Joseph making his statement and that defense counsel had not had time, at that point, to investigate any of the prosecution's potential witnesses. The prosecution states that "before the Pre-interview, the detectives informed [defense counsel] that the police had witnesses who could identify [Joseph] as 'one of the shooters.' Inasmuch as this appraisal occurred in the interview room immediately before the pre-interview, [defense counsel] believed [Joseph] heard it as well." (Internal citations omitted.) In response, Joseph argues that "this alleged exchange was not captured on the videotape that commenced simultaneously with detectives' entry into the room, 9/16 TR at 24, and the circuit court made no finding that the exchange occurred."

II.

On January 13, 2004, Joseph was charged in a multi-party,[3] multi-count indictment with

---

2. The briefs do not indicate the purpose of this form, but our case law has noted that this form is entitled "Warning Persons Being Interrogated of Their Constitutional Rights," *see State v. Crail,* 97 Hawai'i 170, 174, 35 P.3d 197, 201 (2001), and its purpose is to advise an interviewee of his or her *Miranda* rights, *see State v. Edwards,* 96 Hawai'i 224, 227, 30 P.3d 238, 241 (2001).

3. The other parties named in the indictment were Ethan Motta, also known as Malu, and Kevin Gonsalves.

various murder and firearm offenses. On August 27, 2004, Joseph filed a "Motion to Suppress Statement and Evidence" (the motion). Joseph argued that his statement and any seizure of evidence arising from it were inadmissible under Hawai'i Revised Statutes (HRS) § 621–26 and Article I, §§ 5 and 10 of the Hawai'i Constitution because neither the statement nor his waiver of his right to remain silent were voluntarily made. Joseph further argued that the statement should be suppressed because it was a result of the ineffective assistance of defense counsel in violation of his rights under Article I, § 14 of the Hawai'i Constitution and the Sixth Amendment to the United States Constitution.

On September 8, 16, 17, and 30, 2004, the court heard testimony and argument on the motion. Detectives Osmond and Tamashiro, defense counsel, and Peter Wolff (Wolff) testified. Wolff is the Federal Public Defender for the District of Hawai'i and testified as an expert in criminal defense litigation. Wolff opined that defense counsel had not provided Joseph with effective assistance of counsel. On November 4, 2004, the court entered the order. The order in its entirety stated:

Defendant RODNEY JOSEPH, JR. having filed a Motion to Suppress Statement and Evidence on August 27, 2004, and said motion having come for hearing before the Honorable Michael A. Town on September 8, 16, 17, and 30, 2004, with the state represented by Deputy Prosecuting Attorney Lucianne Khalaf, and Defendants Joseph and Kevin Gonsalvez present and represented by Reginald P. Minn and Clifford Hunt, respectively, and with Todd Eddins appearing on behalf of Defendant Ethan Motta, whose presence was waived, and the Court having received the evidence relating to said motion and having considered the arguments of counsel, hereby enters the following findings of fact, conclusions of law, and order.

### FINDINGS OF FACT

1. *On January 7, 2004, Defendant Rodney Joseph, Jr., (hereinafter "Joseph") voluntarily surrendered to officers of the Honolulu Police Department, and he was arrested and placed in custody for the offense of Murder in the Second Degree in connection with the shootings that had occurred earlier that day at the Pali Golf Course.*

2. *Prior to surrendering to the police, Joseph was in brief contact with [defense counsel] and [defense counsel] agreed to provide legal representation for Joseph.*

3. *On the evening of January 7, and January 8, 2004, [defense counsel] met with Joseph. The January 8, 2004 meeting lasted for approximately 20 to 25 minutes in an interview room within the Criminal Investigation Division of the Honolulu Police Department, and immediately thereafter, [defense counsel] stepped out of the interview room and informed detectives Kathleen Osmond (hereinafter "Osmond") and Larry Tamashiro (hereinafter "Tamashiro") (or collectively, "the detectives") that Joseph was prepared to provide a statement.*

4. At the time [defense counsel] told the detectives that Joseph was prepared to provide a statement, [defense counsel]:

 a) had not reviewed any police reports regarding the shootings;

 b) had not discussed the police investigation with the detectives;

 c) had not contacted any deputy within the Office of the Prosecuting Attorney;

 d) had not visited the scene of the shooting, although [defense counsel] was familiar with the Pali Golf Course having golfed at that facility;

 e) had acquired some information regarding the incident from Joseph and media accounts; and

 f) had not conducted any further independent investigation of the incident.

5. At the time [defense counsel] informed the detectives that Joseph was prepared to provide a statement, [defense counsel] was suffering from a broken left arm/wrist, which had been injured on December 31, 2003, and which was causing him pain and discomfort.

6. After suffering the latter injury, [defense counsel] had been taking Vicodin and

Extra–Strength Tylenol to alleviate the pain, but he testified that by January 3, 2004, he had discontinued the use of the Vicodin.

7. After informing the detectives that Joseph was prepared to make a statement, [defense counsel] returned to the interview room where Joseph was waiting, and the detectives entered the interview room behind [defense counsel] after Osmond turned on a video camera which was positioned behind a one-way mirror on the interview room wall.

8. [Defense counsel] did not inquire as to whether the interview would be videotaped, and the detectives did not tell [defense counsel] there would be a video recording in addition to an audiotape of the session by way of Osmond's hand-held audiocassette recorder, which was placed on the interview room table in front of all four parties.

9. *The interview commenced at approximately 7:18 p.m. with [defense counsel] providing the detectives with an "offer of proof" or "proffer" as to the facts that Joseph would be covering in his prospective statement.*

10. [Defense counsel] commenced his proffer without a firm grasp of Joseph's version of the facts:

 a) [Defense counsel] described victim Lepo Utu Taliese, whom Joseph referred to as "Lepo", as "Lapu";

 b) [Defense counsel] described Joseph as being "in charge of the [gambling] houses", although Joseph would later explain that he was merely a supervisor of the doormen/security at illegal gambling establishments;

 c) [Defense counsel] described Joseph operating a Ford Explorer SUV on January 7, 2004, when Joseph had been driving a Ford Taurus at the golf course;

 d) [Defense counsel] was not clear as to whether Joseph possessed a .38–caliber or a .380–caliber firearm;

 e) [Defense counsel] indicated that Joseph had positioned himself behind his opened car door and discharged a firearm over the front of the vehicle towards the mountainside which was situated directly in front of the vehicle.

11. Because the latter description of Joseph's discharging the firearm was contrary to the facts which Joseph would be asserting, *Joseph attempted to correct [defense counsel's] proffer* and explained that he, Joseph, was backed into the space inside his open car door and firing towards the back of his vehicle, away from the mountainside "bluff" and toward the golf course clubhouse.

12. At this point in the colloquy, Osmond repeated back and asked a clarifying question of [defense counsel] regarding Joseph's description of his positioning and Joseph responded "yeah, yeah".

13. *Neither detective provided Joseph with Miranda warnings upon entering the interview room after [defense counsel] informed them that Joseph would be providing a statement, nor at the point where Joseph directly responded to Osmond's clarifying question of [defense counsel].*

14. While an attorney proffering facts to the police would normally conduct such activity outside the presence of his client, [defense counsel] chose to proffer information in Joseph's presence such that Joseph would be likely or even compelled to interject and correct any misstatements, thereby providing evidence which could be used against him in derogation of the purpose behind an attorney proffer.

15. *As the colloquy proceeded, [defense counsel] invited the detectives to challenge Joseph* where there was evidence refuting Joseph's statement ("Say, Rodney, you know, give me a break"), and [defense counsel] commented on the prospect of unfavorable media coverage.

16. *During the colloquy, the detectives informed Joseph that they did not have the authority to enter into any agreement or "deal" in exchange for Joseph's statement* and cooperation, and that only the Office of the Prosecuting Attorney could make such a "deal".

17. [Defense counsel] suggested that Joseph cooperate with the police, implying that he would receive assistance from the

State with bail and sentencing considerations, protection for himself and his family, less disparaging publicity in the media, and further, that Joseph's statement would be confidential for "quite some time", even though the statement could become publicly available within a few days through the preliminary hearing process; and, [defense counsel] did so in a manner which *may have misled Joseph to believe he would receive such benefits in exchange for his statement.*

18. *After Joseph received these suggestions from his counsel, Osmond switched on her cassette recorder* and asked Joseph some preliminary background questions. *Osmond then advised Joseph of his constitutional rights, orally and in writing. Joseph indicated that he understood his rights and waived them. Joseph then provided an audiotaped statement.* In addition, the entire interview—pre-*Miranda* and post-*Miranda*—was videotaped.

19. Given the context in which the waiver occurred and what had transpired during the pre-*Miranda* "proffer" that immediately preceded it, Joseph's waiver of his right to remain silent was not made knowingly, intelligently and voluntarily.

20. *The post-Miranda interview of Joseph immediately followed the pre-Miranda portion, with no lapse in time, no change in location, and no change of interrogators. The detectives' post-Miranda questioning sought a repetition and expansion of information provided during the pre-Miranda session.*

21. At one point during the course of the post-*Miranda* portion, [defense counsel] left the interview room without indicating where he was going or when he would return, and *the questioning of Joseph continued without interruption,* although there was no particularly incriminating information provided by Joseph during [defense counsel's] absence.

22. In the course of his statement, Joseph admitted to possessing and firing a gun during the Pali Golf Course incident, and to destroying multiple firearms with the assistance of George Cambra, Jr. (hereinafter "Cambra").

23. At a September 7, 2004 hearing on the instant motion to suppress, Tamashiro testified that apart from Joseph's January 8, 2004 statement to police, the police do not have any other evidence or any significant eyewitness that provided a statement to the police to the effect that Joseph possessed a firearm and discharged it on January 7, 2004 at the Pali Golf Course.

24. On January 9, 2004, after learning from Joseph that Cambra had assisted him in the destruction of the firearms, Tamashiro contacted Cambra, interviewed the latter, and recovered ammunition with Cambra's assistance.

25. On January 9, 2004, in conformance with Joseph's agreement with the detectives during the January 8, 2004 interview, a Ford Taurus belonging to Joseph's sister was provided to the police.

26. Expert witness attorney Peter Wolff testified that [defense counsel's] assistance to Joseph was below the minimum standard for a competent defense counsel under the circumstances, and the Court is persuaded by this testimony and finds that [defense counsel's] legal assistance to Joseph was not within the range of competence demanded of attorneys in a criminal case for the following reasons:

a) [Defense counsel] allowed Joseph to provide the statement without independent or adequate investigation, or any attempt to learn facts about the case other than media accounts;

b) [Defense counsel] allowed Joseph to provide a statement, apparently without thoroughly interviewing his client and understanding the information that his client would provide in the statement;

c) [Defense counsel] failed to obtain from the police and/or the Office of the Prosecuting Attorney any agreement that would limit the use of Joseph's statement should there be no agreement reached between Joseph and the government;

d) [Defense counsel] proffered facts of Joseph's prospective statement without a thorough understanding of the

facts his client would provide, and did so in the presence of his client;

e) [Defense counsel] sought favorable treatment and assistance from the government, where it was clear that no "deal" could be agreed to by the detectives who were present, and where [defense counsel] had made no effort to contact a deputy from the Office of the Prosecuting Attorney despite the availability of a deputy prosecutor on a 24–hour basis;

f) [Defense counsel] sought favorable treatment and assistance from the government in exchange for Joseph's statement, in a manner which may have misled Joseph to believe that such favorable treatment and assistance would be granted in exchange for his statement.

g) [Defense counsel] informed Joseph that the statement would be confidential for a substantial period of time; and

h) [Defense counsel] failed to object or otherwise protest Tamashiro' assertion that a successful polygraph examination would be a prerequisite to any agreement between the government and Joseph, even though [defense counsel] believed that the polygraph instrument was not completely accurate and that a truthful subject could be found deceptive by a polygraph examination.

## CONCLUSIONS OF LAW

1. *The statement given by Joseph on January 8, 2004 is inadmissible in its entirety, including all portions of both the pre-Miranda "proffer" and the post-Miranda interrogation, because it was not given by Joseph with a knowing, intelligent and voluntary waiver of his right to remain silent.*

2. In accordance with the above Findings of Fact and pursuant to *State v. Bowe,* 77 Hawai'i 51, 881 P.2d 538 (1994) and the other authorities cited in Joseph's memoranda in support of his Motion to Suppress Statement and Evidence, considering the totality of the circumstances the Court finds Joseph's statement was involuntary and therefore obtained in violation of his right against self-incrimination under Hawai'i Constitution Article I, § 10.

3. Because it was involuntary, the Court further concludes that admission of the statement would violate Joseph's right to due process pursuant to Hawai'i Constitution Article I, § 5.

4. As a further independent basis for suppression, the Court also finds that Joseph's statement is inadmissible because Joseph received ineffective assistance of counsel from [defense counsel]. Pursuant to Hawai'i Constitution Article I, §§ 5 and 10 and the Fifth and Fourteenth Amendments to the United States Constitution, Joseph had the right to effective assistance of counsel during both the pre-*Miranda* and the post-*Miranda* portions of the January 8 custodial interrogation.

5. Viewed as a whole, [defense counsel's] representation of Joseph in regard to the interrogation and Joseph's resulting statement fell short of the minimum standard of competence demanded of attorneys in criminal cases.

6. [Defense counsel's] conduct reflected a lack of skill, judgment and diligence and resulted in unlawfully obtained admissions by Joseph.

7. In addition to being inadmissible for the reasons stated above, the post-*Miranda* portion of the statement is *also independently inadmissible pursuant to State v. Pebria, 85 Hawai'i 171, 938 P.2d 1190 (Haw.App.1997) in that it was tainted by the unlawfully obtained pre-Miranda portion of the statement. The pre-Miranda statement was unlawfully obtained* because, as described above, it resulted from [defense counsel's] ineffective assistance of counsel. With no attenuation between the pre-*Miranda* and post-*Miranda* sessions, the interim administration of *Miranda* warnings did not dissipate the taint. Accordingly, the initial illegality was exploited and perpetuated, tainting the entire statement.

8. Because Joseph's statement was not voluntarily made, but rather resulted from

[defense counsel's] ineffective assistance of counsel, the Court also makes an affirmative finding that *it is inadmissible pursuant to HRS § 621-26.*[4] This finding of inadmissibility pursuant to § 621-26 is independent of and in addition to the Court's conclusions that admission of the statement would also violate Joseph's rights to due process and effective assistance of counsel and his privilege against self-incrimination.

9. Because the statement is inadmissible in its entirety for each of the reasons stated above, the Court also concludes that any witnesses or evidence identified or seized as a result of information provided during any portion of the statement is likewise inadmissible. Such witnesses and evidence are tainted by and are the inadmissible poisonous fruits of the excluded statement.

### ORDER

It is therefore ORDERED ADJUDGED AND DECREED:

1. That no portion of Joseph's January 8, 2004 statement may be referenced or used at trial for any purpose;

2. That all audio and video recordings and all written transcriptions of all portions of the statement are hereby suppressed;

3. That no witnesses or evidence obtained as a result of Joseph's statement may be used by the government in preparing for or conducting the trial of this case.

(Emphases added.) On appeal, the prosecution concedes that "[t]he trial court's Findings of Fact ... 1–9, 11–13, 16, 18, 20 and 22–25 fairly represent the state of the evidence in this case." On December 14, 2004, the prosecution filed a notice of appeal from the order.

4. HRS § 621–26 (1993) states as follows:

**Confessions when admissible.** No confession shall be received in evidence unless it is first made to appear to the judge before whom the case is being tried that the confession was in fact voluntarily made.

### III.

■ The prosecution's solitary argument on appeal is that

[t]he trial court erred in suppressing defendant's statement to the police on the ground that the same was involuntarily made on account of the conduct of defendant's attorney during the pre-interview, where a review of the totality of the circumstances surrounding the statement illustrates that defendant provided the same knowingly, intelligently, and voluntarily.

In conjunction with its argument, the prosecution asserts that (1) findings of fact 10, 14, 15, 17, 19, 20,[5] 21, and 26 are "clearly erroneous because they inaccurately reflect the evidence adduced," and (2) conclusions of law 1–9 are wrong. In support of its argument, the prosecution argues that (1) Joseph's right to counsel under the Sixth Amendment of the United States Constitution had not yet attached at the time of the interview on January 8, 2004, (2) *Pebria* is inapposite to the instant case, (3) defense counsel was not ineffective and the trial record does not show "the withdrawal or substantial impairment of a potentially meritorious defense," (4) *Bowe* is inapposite to the instant case, and (5) Joseph was a high school graduate who could read and write English and was not under the influence of drugs or alcohol.

In response, Joseph contends that the order should be affirmed in its entirety. In support of his contention, Joseph argues that (1) "the State should not be permitted to challenge portions of the Order that are consistent with the State's own Proposed Findings of Fact and Conclusions of·Law, which were submitted prior to entry of the Order," (2) "the State failed to demonstrate that Joseph's statement was voluntarily made as required by HRS § 621–26, or that his waiver of the right to silence under Article I, Section 10 was knowing, intelligent and voluntary," (3) "Joseph's right to counsel was

5. We note that the prosecution contends that finding of fact 20 "fairly represent[s] the state of the evidence in this case" but maintains it is clearly erroneous "[t]o the extent [it] forms the basis for the court's [conclusion of law] 7." We read this to be essentially the prosecution's disagreement to the application of *Pebria* to this case.

violated where his attorney failed to provide effective assistance," and (4) "the Circuit Court properly found that the post-*Miranda* statement was the inadmissible poisonous fruit of the pre-*Miranda* admissions."

Defense counsel submitted a "Brief on Behalf of [Defense Counsel]" (brief 1) and a "Reply Brief on Behalf of [Defense Counsel]" (brief 2). In brief 1, defense counsel argues that (1) "the Court erred in allowing Joseph to assert his attorney-client privilege while at the same time allowing Joseph to claim that [d]efense counsel provided Joseph ineffective assistance of counsel," (2) the court erred in making findings of fact 8, 10, and 26 that defense counsel was ineffective in his representation of Joseph, and (3) the court erred in making conclusions of law 4, 5, 6, 7, and 8 that defense counsel was ineffective in his representation of Joseph. In brief 2, defense counsel argues that he is a party in interest and his intervention does not create a conflict of interest.

The prosecution did not submit a reply brief. The prosecution requests that this court reverse the order and remand the case for trial.

## IV.

■ "We review the circuit court's ruling on a motion to suppress *de novo* and must look to the entire record on appeal to determine whether the ruling was right or wrong." *State v. Cuntapay,* 104 Hawai'i 109, 113, 85 P.3d 634, 638 (2004) (internal quotation marks, citations, and brackets omitted). "A trial court's conclusions of law are reviewed under the right/wrong standard." *State v. Keliiheleua,* 105 Hawai'i 174, 178, 95 P.3d 605, 609 (2004) (internal quotation marks and citation omitted). "A conclusion of law is not binding upon an appellate court and is freely reviewable for its correctness."

*Id.* at 178–79, 95 P.3d at 609–10 (internal quotation marks, brackets, and citation omitted). "This 'court examines the facts and answers the question without being required to give any weight to the trial court's answer to it.' " *Id.* at 179, 95 P.3d at 610 (brackets omitted) (quoting *Island Ins. Co. v. Perry,* 94 Hawai'i 498, 501, 17 P.3d 847, 850 (App. 2000)).

## V.

We conclude that on the record, Joseph should have been warned of his right to remain silent prior to the pre-interview.[6] Because he was not provided such warnings, all statements obtained from him must be suppressed, along with the fruits of the pre-interview statements. *Pebria,* 85 Hawai'i at 174–75, 938 P.2d at 1193–94. We note, as mentioned previously, that the prosecution concedes that findings of fact 1, 12, 13, and 20, all regarding the questioning of Joseph and the timing of the *Miranda* warnings, "fairly represent the state of the evidence in this case."

## VI.

■ We emphasize that our decision is based on provisions of the Hawai'i Constitution and not on the interpretation of the United States Constitution by the United States Supreme Court. In *State v. Santiago,* 53 Haw. 254, 265–66, 492 P.2d 657, 664 (1971), this court determined that the protections enumerated in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were also independently grounded in the privilege against self-incrimination contained in the Hawai'i Constitution:[7]

[T]his court is the final arbiter of the meaning of the provisions of the Hawai'i Constitution.... We hold today that *the protections which the United States Su-*

6. Accordingly, we do not decide the prosecution's challenges of findings of fact 10, 14, 15, 17, 21, and 26, inasmuch as such findings are not directly implicated in our disposition.

7. Article I, Section 10 of the Hawai'i Constitution states:

No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury or upon

a finding of probable cause after a preliminary hearing held as provided by law, except in cases arising in the armed forces when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy; *nor shall any person be compelled in any criminal case to be a witness against oneself.*

(Emphasis added.)

preme Court enumerated in *Miranda* have an independent source in the Hawai'i Constitution's privilege against self-incrimination. We hold that the provision requires that before reference is made at trial to statements made by the accused during custodial interrogation, the prosecutor must first demonstrate that certain safeguards were taken before the accused was questioned. Unless other equally effective protections are developed, the prosecutor *must show that each accused was warned that he had a right to remain silent, that anything said could be used against him*, that he had a right to the presence of an attorney, and that if he could [not] afford an attorney one would be appointed for him. We hold that unless these protective measures are taken, statements made by the accused may not be used either as direct evidence in the prosecutor's case in chief or to impeach the defendant's credibility during rebuttal or cross-examination.

*We base our decision on our belief that the privilege against self-incrimination bestows on every accused the right to choose whether or not to confess to the commission of a crime. In order to protect that freedom of choice, we believe that every accused, must be informed of the fact that he has certain rights under the Hawai'i Constitution.* In order to encourage the police to inform persons accused of crimes of their rights, and in order to preserve the integrity of the judicial process, we believe that where the accused is not informed of his rights, any admissions or confessions must be entirely excluded from his trial.

(Emphases added.) As to the importance of the right to remain silent, this court has said:

> Although we have previously stated that "[t]he touchstone of due process is protection of the individual against arbitrary action of the government," we have also stated that the due process clause serves to "protect the right of the accused in a criminal case to a fundamentally fair trial." Implicit in a "fundamentally fair trial" is a right to make a meaningful choice between confessing and remaining silent.

*Bowe*, 77 Hawai'i at 59, 881 P.2d at 546. *See also State v. Kamanao*, 103 Hawai'i 315, 320, 82 P.3d 401, 406 (2003) (explaining that "[t]he right to remain silent, otherwise referred to as the privilege against self-incrimination provides us some of our most treasured protections—preservation of our autonomy, privacy, and dignity against the threat of state action" (internal quotation marks and citations omitted)).

■ We believe the most efficacious way to inform a person of his right to remain silent would be to provide him or her with the *Miranda* warning. *Cf. State v. Chow*, 77 Hawai'i 241, 247, 883 P.2d 663, 669 (1994) (discussing a defendant's right to be heard before his or her sentence is imposed and noting that "[w]e know of no effective or adequate manner in which a defendant's right of presentence allocution may be constitutionally realized than to affirmatively require that the trial court make direct inquiry of the defendant's wish to address the court before sentence is imposed"). The central premise of *Miranda* is the protection of the privilege against self-incrimination, which embodies the right to remain silent.

> [T]he constitutional foundation underlying the privilege [against self-incrimination] is the respect a government—state or federal—must accord to the dignity and integrity of its citizens. To maintain a fair state-individual balance, to require the government to shoulder the entire load, to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth. *In sum, the privilege is fulfilled only when the person is guaranteed the right to remain silent unless he chooses to speak in the unfettered exercise of his own will.*

*Miranda*, 384 U.S. at 460, 86 S.Ct. 1602 (emphasis added) (internal quotation marks and citations omitted).

## VII.

■ Regarding *Miranda* protections, this court has stated that

the requirement of *Miranda* warnings is triggered by [t]wo criteria: (1) the defendant must be under interrogation; and (2) the defendant must be in custody. . . . To determine whether interrogation is custodial, we look to the totality of the circumstances, focusing on the place and time of the interrogation, the length of the interrogation, the nature of the questions asked, the conduct of the police, and [any] other relevant circumstances[.]

*State v. Ah Loo*, 94 Hawaiʻi 207, 210, 10 P.3d 728, 731 (2000) (internal quotation marks and citations omitted). "The test to determine if a custodial interrogation had taken place is whether the investigating officer should have known that his or her words or conduct were reasonably likely to evoke an incriminating response." *State v. Roman*, 70 Haw. 351, 357, 772 P.2d 113, 116 (1989) (citing *State v. Ikaika*, 67 Haw. 563, 698 P.2d 281 (1985) (citing *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980))).

 Interrogation involves any practice reasonably likely to invoke an incriminating response without regard to objective evidence of the intent of the police:

That the matron may not have subjectively intended the question to yield a confession or an incriminating statement is irrelevant. After the defendant was taken into custody, all her responses to police interrogation were inadmissible unless and until the *Miranda* warnings were proven by the prosecution.

[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards *were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.*

*State v. Jenkins*, 1 Haw.App. 430, 437–38, 620 P.2d 263, 269 (1980) (quoting *Innis*, 446 U.S. at 300–01, 100 S.Ct. 1682) (emphasis added). An "incriminating response" refers to both inculpatory and exculpatory responses. *See State v. Wallace*, 105 Hawaiʻi 131, 137, 94 P.3d 1275, 1281 (2004) (stating that "[i]t is a fundamental tenet of criminal law that 'the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination' " (quoting *State v. Naititi*, 104 Hawaiʻi 224, 235, 87 P.3d 893, 904 (2004) (quoting *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602))).

### VIII.

#### A.

 Applying the foregoing propositions to the instant case, it is evident that *Miranda* warnings, as independently grounded in the Hawaiʻi Constitution, were required prior to the pre-interview. Under the first criterion, see *Ah Loo*, *supra*, and according to the definition in *Roman*, the pre-interview constituted interrogation. Interrogation is "express questioning or its functional equivalent." *Ah Loo*, 94 Hawaiʻi at 210, 10 P.3d at 731. Detectives Osmond and Tamashiro met with Joseph and defense counsel in an interview room at the police station for the purpose of interviewing Joseph and obtaining his statement. Detective Tamashiro specifically testified that he understood when defense counsel informed him that Joseph was ready to give his statement to mean that Joseph was "ready to be interviewed."

Detectives Osmond and Tamashiro met with Joseph and defense counsel for approximately twenty-two minutes without providing him with *Miranda* rights. On cross-exami-

nation, Detective Tamashiro testified as follows:

Q: Okay. And is it standard in these kind of—that kind of situation to Mirandize people or not to Mirandize people?

A: To Mirandize people.

Q: *You didn't Mirandize him in that first meeting?*

A: *No, we didn't until we obtained the statement.*

(Emphases added.) Detectives Osmond and Tamashiro participated in defense counsel's proffer and Detective Osmond's remark concerning Joseph's position at the time of the shooting was likely to elicit an incriminating response from Joseph. Finding of fact 12 refers to the following exchange which occurred during the pre-interview:

MR. JOSEPH: The car was into the bluff like this, and the door was open like this.

[DEFENSE COUNSEL]: Right, right, you shooting up the bluff or ——

MR. JOSEPH: No, I'm leaning my back into the vehicle.

DETECTIVE OSMOND: *So, he's leaning with his back against the bluff.*

MR. JOSEPH: *Yeah, yeah.*

(Emphases added.) We agree with Joseph's assertion that Detective Osmond's statement sought confirmation of Joseph's previous statement and was intended to illicit a response. This exchange forms the basis of finding of fact 12, which is not disputed by the prosecution. At no point does the transcript of the pre-interview suggest that either Detective Osmond or Tamashiro attempted to give Joseph his *Miranda* rights. Finding of fact 13, which is not disputed by the prosecution, as stated *supra*, states that neither detective provided Joseph with *Miranda* rights at this point. The transcript indicates that the "words or conduct" on the part of the police were such that the police should have known they were reasonably likely to elicit an incriminating response. *Roman*, 70 Haw. at 357, 772 P.2d at 116.

Additionally, despite their declarations that they did not have the authority to make any deals with Joseph, the detectives encouraged Joseph to speak by indicating that a "deal," if forthcoming, would be "formal" and assured Joseph that anything he told them would be discussed only with the prosecutor's office. As stated in *Jenkins*, the subjective intent of the officers is not dispositive.

**B.**

As to the second criterion, Joseph was clearly in custody as he had been arrested and was being detained at the police station. Finding of fact 1 states that Joseph was in custody and is not disputed by the prosecution. The two criteria of the test being met, *Miranda* warnings should have been given prior to the pre-interview having been conducted.

**IX.**

▪ As concluded *supra*, in the instant case, Joseph's right to remain silent was violated. The *Miranda* warnings include the right to have an attorney present. We conclude that a defendant must be advised of his or her right to remain silent even if there is an attorney present.

In *State v. DeWeese*, 213 W.Va. 339, 582 S.E.2d 786, 790 (2003), the defendant in a felony murder case, who was in custody, was given a polygraph examination wherein he admitted striking the victim. The defendant had been given his *Miranda* rights at the time of his arrest, seven days prior. *Id.* The statements were introduced into evidence and the defendant objected, contending that the statements should have been suppressed because he was not given *Miranda* warnings before the examination began. *Id.* at 794. The prosecution argued, *inter alia*, that the failure to give warnings was not fatal because defendant's counsel was present during the examination. *Id.* at 795. The trial court rejected defendant's contentions and defendant was subsequently convicted. *Id.* at 790. On appeal, the Supreme Court of Appeals of West Virginia reversed. *Id.* at 789. Construing *Miranda*, that court emphasized the need for providing *Miranda* warnings despite the presence of counsel as follows:

Under *Miranda, the mere presence of defense counsel at an interrogation does not negate the necessity for providing the*

*warning against self-incrimination.* This warning, as required by the *Miranda* decision, is an absolute prerequisite to interrogation. Indeed, we have found no decision wherein a court has ruled that a defendant forfeits his [or] her right to be informed of the privilege against self-incrimination merely because he [or] she has exercised the right to have counsel present at an interrogation. In these circumstances, we find it intolerable that one constitutional right should have to be surrendered because of the assertion of another.

*Id.* at 795–96 (emphasis added) (internal quotation marks, brackets and citations omitted).

██ We agree with the proposition advanced by the court in *DeWeese* that the mere presence of counsel does not obviate the need for providing a warning. The right to the presence of counsel is separate and distinct from the right to remain silent. *Miranda*, 384 U.S. at 474, 86 S.Ct. 1602; *Michigan v. Mosley*, 423 U.S. 96, 104 n. 10, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). To relieve the duty of law enforcement officers to inform a defendant of those rights prior to custodial interrogation would defeat the very purpose of *Miranda* warnings. *Cf. Simmons v. United States*, 390 U.S. 377, 394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) ("In these circumstances, we find it intolerable that one constitutional right should have to be surrendered in order to assert another.") Hence, the presence of Joseph's counsel did not obviate the need to warn Joseph that he had the right to remain silent.

We have held that a defendant may waive the rights articulated in the *Miranda* warnings. *See, e.g., Ah Loo*, 94 Hawai'i at 210, 10 P.3d at 731 (stating that "[a]bsent *Miranda* warnings and a valid waiver of them, statements obtained from a person subjected to uncounseled custodial interrogation are inadmissible in a subsequent criminal proceeding brought against that person"); *State v. Hoey*, 77 Hawai'i 17, 881 P.2d 504 (1994) (holding that a valid waiver must be voluntarily, knowingly, and intelligently made); *State v. Amorin*, 61 Haw. 356, 358, 604 P.2d 45, 47 (1979) (explaining that, "[a]fter being so informed [of his or her *Miranda* rights], the defendant may waive these rights provided

the waiver is made voluntarily, knowingly and intelligently"). However, the language by the Court in *Miranda* does not support the proposition that the reading of warnings itself is waivable:

*Prior to any questioning* the person *must* be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right of the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made *voluntarily, knowingly, and intelligently.*

*Miranda*, 384 U.S. at 444–45, 86 S.Ct. 1602 (emphases added). Hence, *Miranda* recognizes a waiver of rights only if those rights are known to the defendant. "Nothing but mischief would flow from a rule that would permit a defendant to waive the right to be informed of the rights embodied in the *Miranda* warnings." *DeWeese*, 582 S.E.2d at 798.

In the instant case, Joseph had counsel. Even if an attorney is present, the thrust of the *Miranda* protections is that it is a personal right against self-incrimination. The Court in *Miranda* explained the need for giving a warning as follows:

*The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court. This warning is needed in order to make him aware not only of the privilege, but also of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege.* Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest.

. . . .

. . . [T]his warning is an absolute prerequisite to interrogation. No amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead.

*Miranda*, 384 U.S. at 469–72, 86 S.Ct. 1602 (emphasis added). Since the right to remain silent is personal, it cannot be deemed waived simply because an attorney is present during interrogation. *See Moran v. Burbine*, 475 U.S. 412, 433 n. 4, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (stating that "[t]he Fifth Amendment right against self-incrimination is a personal right that can only be invoked by the individual whose testimony is being compelled" (internal quotation marks and citations omitted)); *United States v. Nobles*, 422 U.S. 225, 233, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975) (opining that "[t]he Fifth Amendment privilege against compulsory self-incrimination is an intimate and personal one, which protects a private inner sanctum of individual feeling and thought and proscribes state intrusion to extract self-condemnation" (internal quotation marks and citations omitted)); *People v. Avila*, 75 Cal.App.4th 416, 419–20, 89 Cal.Rptr.2d 320 (1999) (noting that "a person's Fifth Amendment right to remain silent is a personal one; it cannot be vicariously asserted by counsel" (internal citations omitted)). The presence of an attorney does not constitute an implied waiver of the right to remain silent. Defense counsel's presence thus was not germane to the personal waiver envisioned under article I, section 10 of the Hawai'i Constitution. Accordingly, the police had an obligation to advise Joseph that he had the right to remain silent.

## X.

Absent a valid waiver of the right to remain silent, statements obtained from a person subjected to custodial interrogation are inadmissible in a subsequent criminal proceeding brought against that person. *Ah Loo*, 94 Hawai'i at 210, 10 P.3d at 731. *See, e.g., State v. Pahio*, 58 Haw. 323, 324, 568 P.2d 1200, 1202 (1977) ("Unless and until the warnings and waiver required by *Miranda* are demonstrated by the prosecution at trial, under *Miranda* the prosecution may not use evidence obtained from the defendant against him if such evidence resulted from custodial interrogation."). The facts of this case demonstrate that Joseph was questioned first, given the warnings, and then interrogated again. As he should have been given the *Miranda* warnings prior to the pre-interview

and as we will demonstrate *infra*, his waiver of them before the post-*Miranda* interview is not effective.

## XI.

Inasmuch as the pre-interview statement was obtained in violation of Joseph's right to remain silent, any post-*Miranda* statement and evidence obtained as a result of the pre-interview and post-*Miranda* statements are excluded under the fruit of the poisonous tree doctrine. In *State v. Fukusaku*, 85 Hawai'i 462, 475, 946 P.2d 32, 45 (1997), this court explained that, "[a]s for the suppression of derivative evidence, the 'fruit of the poisonous tree' doctrine 'prohibits the use of evidence at trial which comes to light as a result of the exploitation of a previous illegal act of the police.' " (Quoting *State v. Medeiros*, 4 Haw.App. 248, 251 n. 4, 665 P.2d 181, 184 n. 4 (1983). (Citing *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920).)).

The Intermediate Court of Appeals (ICA) applied similar rationale in *Pebria* and we adopt its reasoning insofar as it relates to the fruit of the poisonous tree doctrine. *Pebria* involved statements made by Samson Pebria, Jr. (Samson) while he was apparently detained at the Queen's Medical Center related to an assault. 85 Hawai'i at 173, 938 P.2d at 1192. Two security guards were standing with Samson. *Id.* A female was also in the lobby area speaking to Officer Steven Froeschele (Officer Froeschele). *Id.* Officer Samuel Rodriguez (Officer Rodriguez) approached Samson and asked him if he knew why he was being detained. Samson replied, "I went grab the girl." *Id.* After further investigation by another officer, Officer Rodriguez informed Samson "that he was now a suspect in a kidnapping case." *Id.* Samson then responded, "I like rape her." *Id.* The following day another officer informed Samson of his *Miranda* rights and Samson made essentially the same incriminating statements. *Id.*

The ICA determined that each of Samson's statements were made during custodial interrogation. *Id.* at 174–75, 938 P.2d at 1193–94. That court opined that the question, "Do you know why you're being detained?" was tanta-

mount to, "Do you know that you are being detained because the woman talking to Officer Froeschele is accusing you of assaulting her?" *Id.* at 174–75, 938 P.2d at 1193–94. It was concluded that this question amounted to interrogation because Officer Rodriguez "should have known that it was reasonably likely to elicit an incriminating response" from Pebria. *Id.* at 175, 938 P.2d at 1194. The second statement made by Pebria, "I like rape her," was also held to be made in the course of custodial interrogation. *Id.*

The ICA affirmed the circuit court's determinations that the post-*Miranda* statement was the fruit of the pre-*Miranda* statement and, thus, was inadmissible because the latter resulted from the "exploitation" of the former:

> As applied to confessions, the "fruit of the poisonous tree" doctrine holds that where one confession or admission is illegally obtained and subsequently the defendant makes a further confession, the second confession is inadmissible in evidence as a "fruit of the poisonous tree" if it results from an exploitation of the prior illegality. However, a confession made subsequent to an inadmissible one is not automatically inadmissible. Where a confession has been illegally obtained, the government will not be allowed to introduce into evidence a subsequent confession unless it first demonstrates that the latter was not obtained by exploiting the initial illegality or that any connection between the two had become so attenuated that the taint was dissipated.

*Id.* (quoting *Medeiros,* 4 Haw.App. at 252, 665 P.2d at 184). The ICA upheld the circuit court's finding that both statements should be suppressed. *Id.* at 177, 938 P.2d at 1196.

As stated *supra,* the statement obtained from Joseph in the pre-interview was obtained in violation of his right to remain silent. The pre-interview statements were exploited in that Joseph was subsequently questioned on the same matter in order that he would repeat his earlier statement. As Detective Tamashiro related, "[W]e gotta have [the statement] on record." The circumstances also do not suggest that "any

connection between the two [interviews] had become so attenuated that the taint was dissipated." *Id.* at 175, 938 P.2d at 1196. The post-interview was conducted by the same two detectives in the same interrogation room with no lapse in time between it and the pre-interview. This lack of attenuation is discussed in finding of fact 20, which the prosecution apparently does not dispute.[8]

Accordingly, we reject the prosecution's contention that conclusion of law 9 is wrong as a matter of law. The entirety of the prosecution's argument supporting this contention is "[b]ecause Defendant's statement was provided voluntarily, and not illegally obtained, the statement and any evidence therefrom is not inadmissible as the 'fruit of the poisonous tree,' and the trial court's [conclusion of law] 9 and Order to that effect are wrong as a matter of law." As we have held *supra,* the pre-interview statement was tainted as it was obtained in violation of Joseph's right to remain silent. Because we have adopted the ICA's rationale in *Pebria* related to the fruit of the poisonous tree doctrine, as stated *supra,* Joseph's statement made after *Miranda* warnings were given, and any witnesses or evidence resulting therefrom, are inadmissible as fruit of the poisonous tree.

## XII.

We need not decide the prosecution's arguments that (1) Joseph's right to counsel under the Sixth Amendment of the United States Constitution had not yet attached at the time of the interview on January 8, 2004, (2) defense counsel was not ineffective and the trial record does not show "the withdrawal or substantial impairment of a potentially meritorious defense," and (3) Joseph was a high school graduate who could read and write English and was not under the influence of drugs or alcohol. In light of our disposition, we need not reach Joseph's other arguments or defense counsel's arguments.

## XIII.

Based on the foregoing, the court's November 4, 2004 Order Granting [Joseph's]

---

**8.** *See supra* note 5.

Motion to Suppress Statement and Evidence is affirmed.

**Concurring and Dissenting Opinion by NAKAYAMA, J., with whom LEVINSON, J., joins.**

Although I concur in the result, I decline to join in the opinion of the court. I disagree with the court's characterization of the holding in *State v. Pebria*, 85 Hawai'i 171, 938 P.2d 1190 (App.1997). Furthermore, inasmuch as the trial court was mistaken in its conclusion that "the post-*Miranda* portion of the statement is also independently inadmissible pursuant to [*Pebria*] in that ... the initial illegality was exploited and perpetuated, tainting the entire statement," I would not affirm the trial court's determination on the grounds articulated therein.

The majority cites *Pebria* for the proposition that "[b]ecause [Joseph] was not [warned of his right to remain silent prior to the pre-interview], all statements obtained from him must be suppressed, along with the fruits of the pre-interview statements." Majority at V (citing *Pebria*, 85 Hawai'i at 174–75, 938 P.2d at 1193–94). *Pebria* states:

As applied to confessions, the "fruit of the poisonous tree" doctrine holds that where one confession or admission is illegally obtained and subsequently the defendant makes a further confession, the second confession is inadmissible in evidence as a "fruit of the poisonous tree" *if it results from an exploitation of the prior illegality.*

*Pebria*, 85 Hawai'i at 175, 938 P.2d at 1194 (emphasis added). As applied to this case, *Pebria* stands for the proposition that "[b]ecause [Joseph] was not [warned of his right to remain silent prior to the pre-interview], all statements obtained from him must be suppressed" *if such statements result from an exploitation of the pre-interview statement.* In other words, only statements that are themselves "fruits" of the non-mirandized statements must be suppressed. There must be a causal nexus, a "fruiting," a relationship between the suppressed non-mirandized statement and the subsequent mirandized and otherwise-admissible statement such that if the prior statement had not been made, the defendant might not have offered the subse-

quent statement; otherwise, the subsequent statement may be introduced into evidence.

In *Pebria*, the ICA reviewed the following conclusion of the trial court:

Furthermore, the problems Officer Rodriguez had in failing to advise [Pebria] of his constitutional rights carried over into the formal statement with Detective Jones, because Detective Jones relied on those statements to Officer Rodriguez in conducting his interview. And so the Court believes that the statements made to Officer Rodriguez must be suppressed, because [Pebria] was not properly advised of his constitutional rights and the formal statement must also be suppressed, because it is a fruit of the prior illegality.

*Pebria*, 85 Hawai'i at 175–76, 938 P.2d at 1194–95. The ICA stated "These findings are not clearly erroneous and the conclusion is not wrong." *Id.*, 85 Hawai'i at 176, 938 P.2d at 1195. The trial court's seventh conclusion of law in the instant case is analogous to the above-quoted conclusion from *Pebria*. It states that "the post-*Miranda* portion of the statement is also independently inadmissible pursuant to [*Pebria*] in that ... the initial illegality [*i.e.* unlawfully obtaining the pre-*Miranda* portion of the statement] was exploited and perpetuated, tainting the entire statement." In order to uphold the trial court's determination on the grounds articulated in that conclusion, we must independently determine that its conclusion was correct.

The trial court's seventh conclusion of law incorporates a factual determination with respect to whether the subsequent statement "exploited and perpetuated" the "initial illegality" of the inadmissible non-mirandized statement. A conclusion of law that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent on the facts and circumstances of each individual case. As the ICA explained in *State v. Medeiros:*

In determining whether a second confession has become tainted by the prior illegally obtained confession, other courts have established criteria to assist them. Among the criteria most often considered

are the time and place of the subsequent confession, the manner of interrogation, whether there was representation by counsel, the defendant's mental condition, conduct of the police, whether the defendant has had an opportunity to speak with family and friends, whether the defendant is in a position where he believes that his first confession has made his present position hopeless, and whether the subsequent confessions were a product of interrogation or voluntarily made.

*Medeiros,* 4 Haw.App. 248, 252–53, 665 P.2d 181, 184–85. In performing this determination, we are mindful of the phenomenon described by the United States Supreme Court in *United States v. Bayer:*

> Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first.

*Bayer,* 331 U.S. 532, 540–41, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947). However, as the court noted in *Bayer,* it had "never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed." *Id.* Neither have we.

Having performed a searching review of the transcripts of both the pre-interview and the purportedly tainted post-*Miranda* statement, and in light of the criteria collected in *Medeiros,* I am left with a firm and definite conviction that the trial court was mistaken in its conclusion that "the initial illegality was exploited and perpetuated, tainting the entire statement." The defendant consulted with his family and counsel and decided to turn himself in. After further consultation with counsel, the defendant then participated with his counsel in a proffer. Following the proffer, the defendant, in the company of counsel and having gone through the *Miranda* ritual, made a statement to the police. Nothing in the transcripts suggests improper conduct by the police, an inappropriate mental state on the defendant's part, or any belief on the defendant's part that his participation in the proffer had made his situation hopeless, such that he had no choice but to reiterate and expand upon any prior inculpatory statements elicited during the proffer. In short, there is no credible evidence of sufficient quality and probative value to justify a reasonable person in a conclusion that the subsequent statement came to light as a result of the exploitation of the inadmissible non-mirandized statement. On the contrary, the evidence strongly supports the following inferences: (1) prior to the interview, the defendant, relying on the advice of counsel, had made up his mind to make a statement to the police; (2) nothing transpired during the proffer that either influenced the defendant's subsequent decision to waive his right against self-incrimination or enabled the police to obtain information that the defendant would not have otherwise revealed in his post-waiver statement; and (3) if the proffer had not been made, and the interview instead had begun with the *Miranda* ritual and proceeded directly into formal interrogation of the defendant, the defendant would have provided a fungibly-inculpatory statement. Consequently, I would hold that the trial court was wrong in its conclusion that "the post-*Miranda* statement is also independently inadmissible pursuant to *State v. Pebria.*"

I concur in the result because the circumstances demonstrate that the defendant received ineffective assistance of defense counsel in connection with the defendant's waiver of his right against self-incrimination. The *Miranda* warnings have significance beyond mere ritual only to the extent that they effectively safeguard the oft-articulated requirement that a defendant's waiver of his constitutional right against self-incrimination be "knowing, intelligent, and voluntary." It is apparent from the record that the defendant's waiver, based on advice from counsel that did not meet the minimum requirements of effective assistance, was not "knowing, intelligent, and voluntary." I would uphold the trial court's determination on that basis, as articulated in its first conclusion of law.