STATE OF HAWAII, Plaintiff-Appellee, *v.* MARGARET
JENKINS, also known as Kimberly Sims, Kimberly
Johnson, Carole DeRoche Robinson, Carole Ethylyn
DeRoche, Shirly Simmons, Jacqueline Rogers, and
and Carole Ethylyn Prentice, and BETTY JONES, also
known as Betty Williams, Dorothy Jean Smith, Sarah
Brown and Dorothy Jean Washington, Defendants,
and LINDA WILLIAMS, also known as Linda Walker,
Betty Jones and Darnell Beatrice Hartfield,
Defendant-Appellant

NO. 6344

DECEMBER 4, 1980

HAYASHI, C.J., PADGETT AND BURNS, JJ.

OPINION OF THE COURT BY BURNS, J.

Defendant-Appellant Linda Williams appeals from a jury
verdict and judgment of the First Circuit Court convicting her
of theft in the first degree. *See* Hawaii Revised Statutes (HRS)
§ 708-831 (1976). She asserts that the trial court erred in two

respects: first, by denying her motion to dismiss the indictment because of an inaccurate summary of evidence by a deputy prosecuting attorney to the grand jury; second, by admitting into evidence her response to a police matron's question without the prosecution having first shown the application of procedural safeguards mandated by *Miranda v. Arizona,* 384 U.S. 436 (1966).

Appellant claims that the trial court erred in denying her motion to dismiss the indictment. The motion was based on the fact that at the second of two grand jury proceedings leading to the indictment, a deputy prosecuting attorney gave an inaccurate summary of the testimony presented to the grand jury at the first proceeding.

At the first proceeding, on March 24, 1976, a two-count indictment was presented to the grand jury. Count I charged Defendants Jenkins, Jones and Williams with having obtained or exerted unauthorized control over property, to wit, money, from the person of Chester Childs. Count II charged the same defendants with the same offense, but as to a different victim, Odes A. Wilderson.

On Count II, Wilderson testified that he and a friend had been "propositioned" by three women. The one in front of him made passes at him and one of the other two, who was behind him, slipped his wallet out of his pocket. He saw one of the women throw his wallet under a parked car. He recovered the wallet, but not the $100.00 which had been inside. He said he could identify two of the three women involved.

On Count I, Officer Dennis Royal testified[1] that Chester Childs had reported being bumped, felt and fondled by three women as they were asking him if he wanted a date; that he checked for his money immediately following the encounter, found it missing, stopped them, demanded his money back, and became involved in an argument with them. He identified Jenkins, Jones and Williams. Mr. Childs said he lost $160.00, all in $20.00 bills that had been folded over in his right front

---

[1] According to Officer Royal's testimony, Chester Childs was then on ship and at sea.

pocket. One hundred twenty dollars ($120.00), in $20.00 bills, had been recovered from one of the suspects at the police station by one of the matrons. In response to the grand jury foreman's question, Officer Royal testified that no wallet was involved in the alleged offense.

At the second grand jury proceeding, on April 7, 1976, a different deputy prosecuting attorney appeared before the grand jury. After reminding the jurors that they had heard the evidence in a prior hearing, the following ensued:

[DEPUTY PROSECUTOR:] There was a two count indictment against those three individuals for a theft in the first degree. And we had a — as to the first count at the prior hearing, we had a police officer testify for a Chester Childs, who was at sea at the time. If you recall he testified that he was propositioned by these three defendants. Chester Childs was propositioned by the three defendants, that he was patted or fondled. While his attention was taken away from him, one of the defendants took his *wallet*. And he commanded it back. And there was a struggle. *And they got away*.

The police *later* apprehended the individuals, *brought them back to the scene*. And the officer testified that he was at the scene when the defendant — excuse me, Chester Childs identified these three individuals as taking his *wallet*.

And then we presented another witness to count two. And we were unable to get a satisfactory identification, so we continued count two.

Today we'll just proceed with the one count. And it's requested that you vote on that in the evidence as you recall.

For the record, I should say, what I've said as to the evidence is not evidence. What the witness testified to is the evidence that you are to consider as to whether you vote for a true bill or not. What I say is just to remind you, or to help refresh your memory as to what the evidence is. It's not evidence.

With that I will let you —

THE FOREMAN: Is the transcript available?

[DEPUTY PROSECUTOR:] It's not available at this point. If there is a problem with what was testified to, it would be easier just to bring — there was the one officer. We can bring him back, although we may not be able to get him today.

(At this time counsel and this reporter left the Grand Jury room.)

(Emphasis added).

The emphasized portions of the summary are obviously inaccurate.

Appellant asserts that "[a]n indictment based upon an inaccurate summary of evidence presented at a prior proceeding is fatally defective", relying on *Abbott v. Superior Court of Pima County,* 86 Ariz. 309, 345 P.2d 776 (1959).

Appellant's assertion may be correct in the abstract, but it has not been shown that the indictment in this case was *based upon* the second deputy prosecutor's inaccurate summary. In *Abbott, supra,* several grand jurors were absent when evidence was presented but voted on the indictment after being told of the testimony adduced in their absence. The Arizona Supreme Court did not approve:

> Such a practice, although no doubt innocently conceived and executed in this case, would be most dangerous and could result in great injustice by incorrectly informing such jurors as to what was actually said by the witnesses. It is indubitably true that no two people who have heard the testimony of a witness for five minutes can repeat the substance of it alike.

345 P.2d at 778.

Here, however, as appellant admits, there is no indication that any grand juror was absent when Officer Royal testified. She argues that "[a]fter two weeks of dimmed memory, all that the grand jurors had to rely on was the summary. . . ." This is simply speculation. The second deputy prosecutor made it clear that his summary was not in itself evidence and that Officer Royal could be recalled "[i]f there is a problem with what was testified to. . . ."

There is a presumption that an indictment has been found by a grand jury upon sufficient evidence, and that the grand

jury acted upon legal evidence. *State v. Layton*, 53 Haw. 513, 516, 497 P.2d 559, 561 (1972). Appellant does not contend that the evidence presented was insufficient to establish probable cause.

Unless the prosecutor's misconduct before a grand jury is extreme and clearly infringes upon the jury's decision-making function, it should not be utilized as a stepping stone to dismissal of an indictment. *State v. Pulawa*, 62 Haw. 209, 614 P.2d 373 (1980) (quoting with approval *State v. Schamberg*, 146 N.J. Super. 559, 564, 370 A.2d 482, 485 (1976)). We do not see how the deputy prosecutor's statements, which are admittedly lamentable, clearly infringed on the jury's decision-making function. He did not, for example, improperly attempt to bolster the credibility of a witness, as was the case in *State v. Joao*, 53 Haw. 226, 491 P.2d 1089 (1971), or to give an opinion on the legal sufficiency of the evidence. We find no error in the trial court's denial of appellant's motion to dismiss the indictment.

\* \* \* \* \*

Appellant next contends that the trial court erred in admitting into evidence her response to a police matron's question absent a prior showing by the prosecution that she had received *Miranda* warnings.

At trial, the State's complaining witness, Chester Childs, testified as follows: On December 30, 1975, he received $294.00 military pay in cash and took about $220.00 of same with him to Honolulu. Arriving at 8:00 p.m., Mr. Childs proceeded to the Realtor Bar on Hotel Street, where he played pool and had about four beers followed by about six mixed drinks (Seagram 7 and coke).

He left the Realtor at about 1:15 a.m. and went to the Club Hubba Hubba, where he had two to four more of the same mixed drinks. Upon leaving, at about 2:00 a.m., he counted his money, placed $14.00 in his left front pants pocket and the remainder,[2] all in $20.00 bills, in his right front pants pocket.

---

[2] According to his testimony. the remainder may have consisted of five, six or seven $20.00 bills

He walked to a small cafe on Smith Street to get something to eat. Finding it closed, he reversed his steps and began walking toward Hotel Street. Walking toward him were three women — Linda Williams and possibly her co-defendants, Margaret Jenkins and Betty Jones. (Mr. Childs' identification of the latter two was uncertain.)

When the women reached him, Williams asked him if he "wanted to have a good time" and he felt hands go into his pockets, touching his legs, his "butt" and his side.

He declined the offer, tried to knock the hands down and to keep them out of his pockets, and pushed his way past the women. He walked four or five steps past them, checked his right front pocket, found it empty, and called to them. They stopped. He demanded the return of his money, but the women claimed ignorance. He grabbed one woman's hand and dragged her toward Hotel Street.

Honolulu Police Department Sergeant Clement Enoka, who saw the group approach Hotel Street, observed the other two women hitting Childs over the head. The sergeant pulled his car alongside the group. The women started to walk away. Sergeant Enoka ordered them to stop and come back, which they did. He talked briefly to Childs, radioed for assistance, and when it arrived, in the person of Officer Dennis Royal, the women were placed under arrest for theft in the first degree. They were transported to the police station, hands cuffed behind their backs.

The suspects were brought to Police Matron Louise Goo to be searched. Sergeant Enoka had previously called Matron Goo and told her the women were coming in. He said they were probably involved in a theft one case and told her to search them very carefully for money.

At trial, Matron Goo, called as a witness by the prosecution in its case in chief, testified as follows on direct examination:

Q. Who did you search first?
A. Linda Williams.
Q. And where did you conduct the search?
A. In the bathroom at the Receiving Desk.
Q. And how did you conduct the search?

A. I took her in and *I asked her if she had any money that she might have and she said she didn't have any money.* So I started to — I told her to start stripping and to give me her clothing and searched her clothing as she was giving it to me. And while she was standing there nude I asked her to bend over forward where her vagina cavity would be showing, and that's where I saw the money sticking out from the vagina cavity.[3]

(Emphasis added).

At a bench conference, Williams' attorney objected to the testimony as an incriminating statement by the defendant on the basis, *inter alia,* that there had been no showing that the defendant's statement was made after *Miranda* warnings had been given. The trial judge overruled the objection.

On cross-examination, Matron Goo agreed that she had not warned the defendants that "anything they said would be used against them". Neither of the police officers who testified were asked, and neither said, whether they had given *Miranda* warnings to the defendants.

In *Miranda v. Arizona,* 384 U.S. 436 (1966), the United States Supreme Court held that:

[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards[4] effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

384 U.S. at 444 (original footnote omitted; new footnote added).

---

[3] The validity of the search is not among the issues raised on this appeal.

[4] Where an individual is being subjected to custodial interrogation, he may not be asked any questions without his first being advised of his right to remain silent, that anything he says can and will be used against him, that he has the right to have his attorney present, and that if he cannot afford counsel, one will be appointed for him prior to any interrogation.

*State v. Kalai,* 56 Haw. 366, 368, 537 P.2d 8, 11 (1975). *See Miranda v. Arizona, supra,* 384 U.S. at 467-474.

In *State v. Amorin,* 61 Haw. 361, 366, 604 P.2d 45, 49 (1979), the Hawaii Supreme Court stated:

> The mandate of *Miranda* is unequivocal: before any questions are asked of an in-custody suspect, the required warnings must be given and unless and until such warnings are proven by the prosecution, no statements obtained as a result of custodial interrogation may be used.

*See also State v. Reese,* 61 Haw. 499, 605 P.2d 935 (1980).

Certainly, on its face, the admission of Matron Goo's report of the defendant's response to her question violated *Miranda.* Defendant Williams was in police custody; the question was asked by Police Matron Goo; the prosecution used the response in its case in chief, and did so without having demonstrated the use of the procedural safeguards *Miranda* mandated.

The State contends that the questioning prohibited by *Miranda* involves only inquiries designed to elicit information about the suspect and his relationship to the crime and that the matron's question was not intended to yield a confession, or an incriminating statement, but rather was part of the search to discover physical evidence and was intended to expedite the search.

The proposition that questioning otherwise prohibited by *Miranda* is somehow acceptable if it is part of a search to discover physical evidence is unsupported and without merit.

That the matron may not have subjectively intended the question to yield a confession or an incriminating statement is irrelevant. After the defendant was taken into custody, all her responses to police interrogation[5] were inadmissible unless

---

[5] [T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard

and until the *Miranda* warnings were proven by the prosecution. *State v. Amorin, supra; State v. Reese, supra.*

We hold that the trial court erred in not excluding that portion of the matron's testimony containing her question and the defendant's response. The question remains, however, whether the error necessitates reversal.

Unless the reviewing court is able to declare a belief that a constitutional error of the trial court is harmless beyond a reasonable doubt, the answer is yes. *State v. Pulawa, supra; State v. Napeahi,* 57 Haw. 365, 556 P.2d 569 (1976); *Chapman v. California,* 386 U.S. 18 (1967).

In the factual circumstances of this case, we cannot say that the error was harmless beyond a reasonable doubt. The error allowed testimony obviously damaging to defendant's credibility in a case in which credibility was crucial.[6] Furthermore, the error was magnified by the following jury instruction given by the trial court at the State's request over the objection of defense counsel:

> An attempt by a defendant to conceal evidence, if the jury finds the evidence that there was such an attempt, is a circumstance in establishing the guilt of the Defendant, and it is a circumstance which you may consider in connection with all of the other evidence in determining the guilt or innocence of the defendant.
>
> The weight to which the attempt to conceal is entitled is a matter for the jury to determine in connection with all

---

to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

(Footnotes omitted). *Rhode Island v. Innis,* 100 S. Ct. 1682, 1689-1690 (May 12, 1980).

[6] The case boiled down to Childs' word against appellant's. Her defense was essentially that the money recovered from her had been given to her for safekeeping earlier that evening by another prostitute and that Childs' version was not credible, stress being placed on his intoxication and inconsistencies in his testimony.

the facts brought out in the case, together with the evidence, if any, introduced in explanation thereof.

The statement thus not only served to attack the defendant's credibility, but also may have been used by the jury as substantive evidence of guilt.

The defendant's conviction is reversed and remanded for proceedings consistent with this opinion.

*Michael Tanigawa (Edmund K. U. Yee* and *Kenneth T. Okamoto* on the briefs), Deputy Public Defenders, for defendant-appellant.

*Arthur E. Ross,* Deputy Prosecuting Attorney, for plaintiff-appellee.