**Electronically Filed
Supreme Court
SCWC-12-0001017
25-MAY-2017
09:21 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

STATE OF HAWAIʻI,
Respondent/Plaintiff-Appellant,

vs.

RICK TRINQUE,
Petitioner/Defendant-Appellee,

and

MILES MARTINEZ,
Defendant.

SCWC-12-0001017

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-12-0001017; CR. NO. 12-1-0105)

MAY 25, 2017

RECKTENWALD, C.J., McKENNA, POLLACK, AND WILSON, JJ., AND CIRCUIT
COURT JUDGE CHANG, IN PLACE OF NAKAYAMA, J., UNAVAILABLE

OPINION OF THE COURT BY POLLACK, J.

## I.  INTRODUCTION

On March 19, 2009, Rick Trinque was arrested in a
pasture and handcuffed by the police who were conducting an

investigation involving the growing of marijuana. Prior to apprising Trinque of his <u>Miranda</u> rights, police obtained two statements from Trinque. Later, at the police station, police obtained a third statement from Trinque when he invoked his right to counsel while being given <u>Miranda</u> warnings. The Circuit Court of the Fifth Circuit (circuit court) concluded that the first and second statements had been unlawfully elicited from Trinque, as they resulted from pre-<u>Miranda</u> custodial interrogation, and that the third statement was a product of the two earlier illegally obtained statements. The circuit court accordingly excluded the statements from being used as evidence at trial. The State appealed the circuit court's decision regarding the second and third statements. The Intermediate Court of Appeals (ICA) disagreed with the circuit court and vacated its ruling as to the second and third statements.

In his application for certiorari, Trinque contends that the circuit court correctly ruled that the second and third statements were obtained in violation of his constitutional rights and that the ICA gravely erred in vacating the circuit court's decision. For the reasons set forth below, we conclude that the ICA erred in vacating the ruling of the circuit court.

## II.  BACKGROUND

### A. Underlying arrest

In the days prior to March 19, 2009, the Kaua'i Police Department (KPD) received information that there was marijuana growing in a 25-acre pasture in Kīlauea, Kaua'i, and initiated an investigation.  On March 19, 2009, KPD officers were conducting nighttime surveillance in the pasture when they encountered Trinque, who was placed under arrest and immediately placed in handcuffs by Officer Brian Silva (the case agent in charge of the operation) while still in the pasture.[1]  Miles Martinez was also arrested in the pasture.  Both Trinque and Martinez were ordered to sit on rocks within the pasture while officers took pictures of them and obtained their identification.  As Officer Silva and another officer were escorting Trinque out of the pasture, one of the officers asked Trinque how he came into the field.  Trinque responded that "he came over the fence by the banana tree using a ladder that was still located by the fence and that he was caught red handed" (Statement 1).  Once out of the pasture, Trinque was ordered by the officers to sit on a wooden bench.  Trinque remained handcuffed.

---

[1]    Trinque was "at least one of the targets of [KPD's] investigation." Lt. Richard Rosa stated that "[b]ecause of the briefing that we had prior [to March 19] . . . we had the names of two of the suspects based on who lived there and stuff, and the officers told me who they were."

Officer Silva directed Lt. Richard Rosa to watch over Trinque. Lt. Rosa was the supervisor for the vice unit and a case supervisor at that time. That night, Lt. Rosa was dressed in plain clothes, with his police badge around his neck. Lt. Rosa had never met Trinque before, but "he knew Rick Trinque by name" because Trinque's daughter, whom Lt. Rosa had previously assisted in a case, had informed him that Trinque was her father.[2] KPD officers told Lt. Rosa who the two detained suspects were, and Lt. Rosa knew that it was Trinque sitting on the wooden bench when he approached.

Lt. Rosa identified himself to Trinque as Lt. Rosa from the Narcotic Unit of KPD, and he informed Trinque that he was the officer who worked on his daughter's case. Lt. Rosa then told Trinque "that if [Trinque] did not believe him, he could talk to his daughter about it." In an apparent effort to emphasize his trustworthiness, Lt. Rosa told Trinque that "he would not lie to him." Next, he informed Trinque that he would not "jerk his chain." And, to underscore this point, Lt. Rosa told Trinque that "he would be completely honest with him." During these statements, Trinque "sat there listening" and did not speak to Lt. Rosa. When Lt. Rosa "told Trinque to not make any statements

---

[2] Prior to being assigned to the vice unit, Lt. Rosa was the district commander in Hanalei when he "assisted" Trinque's daughter with her case. Lt. Rosa met Trinque's daughter when she expressed to him that she was having problems with persons who might have intended to assault her father.

4

until [they] got back to Lihue where we could advise him of his rights,"[3] Trinque responded, "What for?  You caught us red handed, there's nothing left to say, times are hard and we needed the money" (Statement 2).

Soon after, Lt. Rosa and Officer Silva transported Trinque to the Līhuʻe police station, where he was booked and placed in an interrogation room.  Both Lt. Rosa and Officer Silva were present during Trinque's interview in the interrogation room.  Trinque was informed of his constitutional rights via the KPD Form 364.  Officer Silva asked Trinque if he wanted an attorney, and Trinque responded that he did.[4]  Officer Silva then asked Trinque

---

[3]     Lt. Rosa noted that there were other police officers around at the time he approached Trinque and agreed that it was possible to have read Trinque his rights at the scene.

[4]     Nowhere on the KPD 364 Form, entitled "Informing Persons Being Interrogated of Their Constitutional Rights," does it direct police officers to ask whether a defendant wants an attorney.  Specifically, No. 6 on the form states, "Do you understand that you have the right to talk to a lawyer before answering any questions and to have him or her present while I talk to you?"  Thus, the question asks whether the individual understands that he or she has a right to have an attorney present, not whether he or she wants an attorney.

On direct examination during the circuit court hearing, Officer Silva testified as follows:

> Q:    Did Mr. Trinque respond when you asked him whether he wanted an attorney or not?
> A:    Yes.
> Q:    What was his reply?
> A:    He wanted to talk to an attorney.

On cross-examination, Officer Silva was less confident:

> Q:    . . . So at what point did you ask him if he wanted an attorney?
> A:    Um, he might have told me he wanted an attorney, and that was the end of the conversation.

(continued . . .)

whether or not he wanted to make a statement.[5]  Trinque replied that he did not want to make a statement since "he got caught red-handed and was going to jail anyway."[6]  (Statement 3)  During the approximately three hours following Trinque's arrest, Lt. Rosa remained at Trinque's side from their initial contact, during transport, and to Trinque's placement in the interrogation room where Statement 3 was obtained.

### B. Circuit court proceedings

On February 23, 2012, Trinque was charged by indictment with Commercial Promotion of Marijuana in the First Degree, in violation of Hawaii Revised Statutes (HRS) § 712-1249.4(1)(c)

---

(. . . continued)
> Q:   What do you mean he might have told you?
> A:   This happened almost four years ago.  He might have told me he wanted an attorney as I'm going through the rights, and I said okay, fine.  We're not going through this.

[5]   The sequence of questions and answers between Officer Silva and Trinque is unclear from the transcript of the hearing on the motions.  However, the transcript could be read to indicate that Officer Silva continued speaking with Trinque after Trinque made clear that he wanted an attorney.  We note that, if this were the case, Officer Silva would have violated the well-established rule that "once the right to counsel has been invoked all questioning must cease."  State v. Mailo, 69 Haw. 51, 52, 731 P.2d 1264, 1266 (1987).  It is not necessary to resolve this issue in light of our disposition of this case.

[6]   Trinque's interview by Officer Silva and Lt. Rosa in the interrogation room was not audio or video recorded, despite officers having access to a digital recorder.  Officer Silva stated that Trinque's interview was not recorded because, at that time, KPD policy did not require officers to do so.  While Officer Silva took notes when interviewing Trinque, he shredded them once he finished his report.

(1993), and Unlawful Use of Drug Paraphernalia, in violation of HRS § 329-43.5(a) (1993).[7]

The State filed a Motion to Determine Voluntariness of Statements, contending that Trinque made inculpatory statements upon arrest and that the statements were admissible at trial. Trinque filed a motion seeking to suppress Statements 1, 2, and 3 on the grounds that they were obtained in violation of his constitutional rights under article I, sections 5 and 10 of the Hawai'i Constitution and the Fifth and Fourteenth Amendments to the United States Constitution (Motion to Suppress Statements). Trinque contended that he was subjected to pre-Miranda custodial interrogation when he made Statements 1 and 2, in violation of his

_____

[7] HRS § 712-1249.4(1)(c) provides as follows:

(1) A person commits the offense of commercial promotion of marijuana in the first degree if the person knowingly:

. . . .

(c) Possesses, cultivates, or has under the person's control one hundred or more marijuana plants . . . .

The applicable version of HRS § 329-43.5(a) states the following:

(a) It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this chapter. Any person who violates this section is guilty of a class C felony and upon conviction may be imprisoned pursuant to section 706-660 and, if appropriate as provided in section 706-641, fined pursuant to section 706-640.

Martinez was jointly indicted with Trinque upon the same charges.

right against self-incrimination. Trinque also argued that his post-<u>Miranda</u> statement (Statement 3) should be suppressed as a "fruit of the poisonous tree" because "the statement was made under the taint of the two prior police illegalities."

In its response, the State argued that Trinque "voluntarily made inculpatory statements upon arrest." The State maintained that Statement 1 was a spontaneous statement and that Statements 2 and 3 "were voluntary and not the result of KPD coercion." Further, the State contended that Trinque's statements were independent of police questioning and that Trinque kept talking even after he was advised not to make a statement until he was taken to the station and given <u>Miranda</u> warnings.

Following a hearing on the motions,[8] the circuit court issued its Findings of Fact, Conclusions of Law and Order Granting Defendant's Motion to Suppress Statements (Order Suppressing Statements), in which it determined that, as to Statement 1, Trinque was "in custody for purposes of <u>Miranda</u>" from the moment he was placed in handcuffs in the pasture. The court found that either Officer Silva or the other officer escorting Trinque out of the pasture specifically asked Trinque how he came into the field and that the question prompted Trinque to respond that he "came over the fence by the banana tree using a ladder that was still

_____

[8] The Honorable Kathleen N.A. Watanabe presided over the case.

located by the fence and that he was caught red handed." The circuit court concluded that "asking the defendant how he got into the pasture was an illegal custodial interrogation that the officer knew or should have known was reasonably likely to elicit an incriminating response" and that the question did in fact improperly elicit Statement 1.

The circuit court further concluded that Statement 2 was the product of an illegal, pre-Miranda custodial interrogation. The court held that Lt. Rosa's "unsolicited statements" to Trinque amounted to "statements that were designed to garner the trust of the defendant . . . and invite the defendant to open up." Thus, the circuit court concluded that Lt. Rosa conducted an unauthorized pre-Miranda interrogation in violation of Trinque's constitutional rights. The circuit court stated that "there was no legitimate reason" for Lt. Rosa to make these statements to Trinque, including:

> telling [Trinque] that he wasn't sure if [Trinque] knew who he was, but that he was the Officer who worked on [his] daughter's case, that if Trinque did not believe him, [he] could talk to his daughter about it, that he would not lie to [Trinque], he would not "jerk his chain," and that he would be completely honest with him.

The circuit court concluded that Lt. Rosa knew or should have known that his statements would likely elicit an incriminating response. The court further held that Lt. Rosa's statement--that Trinque should not make a statement until he was taken to the Līhu'e police station--was presupposition on Lt. Rosa's part and

that it "wrongly informed [Trinque] that his statement would be taken once they read him his rights."

As to Statement 3, the circuit court concluded that it "was a 'fruit' or an exploitation of the prior illegality of the 'pre-interview' conducted by [Lt.] Rosa." The court held that Statement 3 was not sufficiently attenuated from Lt. Rosa's unauthorized, pre-<u>Miranda</u> interview for the taint of the prior illegality to dissipate because (1) the same officer (Lt. Rosa) remained with Trinque through the entire process; (2) Statement 3 came within hours of the pre-interview <u>Miranda</u> violation; and (3) Statement 3, elicited post-<u>Miranda</u>, was in effect the same thing Trinque said to Lt. Rosa (Statement 2).

The circuit court therefore granted Trinque's Motion to Suppress Statements and issued an Order Suppressing Statements and an Order Denying State of Hawaii's Voluntariness of Statements.[9] The State timely appealed from these orders.

## C. Appellate Proceedings

The State raised two issues in its appeal: (1) whether the trial court erred in concluding that Statement 2 was the product of a custodial interrogation and in suppressing Statement

---

[9] The circuit court's Order Denying Voluntariness was predicated on its suppression ruling in favor of Trinque: "The Court having taken judicial notice of the files and records herein and having heard evidence and argument in the matter, and having GRANTED [Trinque's] Motion to Suppress Statements, hereby ORDERS that the State's Motion to Determine Voluntariness of Statements is hereby DENIED."

2 on that basis; and (2) whether the trial court erred in suppressing Statement 3 as the unlawful fruit of Statements 1 and 2. The State did not challenge the suppression of Statement 1.

In a published opinion, the ICA held that the circuit court erred in suppressing Statement 2 on Miranda grounds because Statement 2 was made when Lt. Rosa told Trinque that he should not make any statements until he had been advised of his constitutional rights. State v. Trinque, 137 Hawai'i 130, 133, 366 P.3d 186, 189 (App. 2016), cert. granted, No. SCWC-12-0001017, 2016 WL 3129189 (Haw. June 2, 2016). The ICA noted that "there was no basis for the circuit court to conclude that [Lt.] Rosa should have known that his words or actions in telling Trinque not to speak were reasonably likely to elicit an incriminating response." Id.

Further, the ICA concluded that neither Statement 2 nor Statement 3 was subject to suppression as an unlawful fruit of previous statements. Id. at 134, 366 P.3d at 190. The ICA held that Statement 2 was not an unlawful fruit of Statement 1 because the police did not exploit Statement 1 to obtain Statement 2. Id. The ICA also held that Statement 3 was not subject to suppression as an unlawful fruit of Statement 2 because Statement 2 was not the product of interrogation. Id. In addition, the ICA determined that Statement 3 was not a fruit of Statement 1 because Trinque made Statement 3 post-Miranda, police did not exploit

Statement 1 to obtain Statement 3, and Statement 3 was a non-responsive reply to the question asked. Id.

The ICA vacated the circuit court's Order Suppressing Statements and Order Denying Voluntariness of Statements, and the case was remanded to the circuit court for further proceedings. Id. at 135, 366 P.3d at 191. On certiorari, Trinque presents the following question: whether the ICA gravely erred in vacating the circuit court's decision suppressing Statements 2 and 3 to the police.

### III. STANDARDS OF REVIEW

This court reviews a trial court's factual findings under the clearly erroneous standard. State v. Romano, 114 Hawai'i 1, 8, 155 P.3d 1102, 1109 (2007).

> A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed. A finding of fact is also clearly erroneous when the record lacks substantial evidence to support the finding. We have defined substantial evidence as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

Lambert v. Waha, 137 Hawai'i 423, 431, 375 P.3d 202, 210 (2016) (quoting Bremer v. Weeks, 104 Hawai'i 43, 51, 85 P.3d 150, 158 (2004)). A trial court's conclusions of law are reviewed under the right/wrong standard. State v. Joseph, 109 Hawai'i 482, 493, 128 P.3d 795, 806 (2006). Where a conclusion of law "presents mixed questions of fact and law," it "is reviewed under the

12

clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case." State v. Furutani, 76 Hawai'i 172, 180, 873 P.2d 51, 59 (1994) (quoting AIG Haw. Ins. Co. v. Estate of Caraang, 74 Haw. 620, 629, 851 P.2d 321, 326 (1993)).

## IV.  DISCUSSION

The privilege against self-incrimination guaranteed by article I, section 10 of the Hawai'i Constitution requires that Miranda warnings be given to an accused in order for statements obtained during custodial interrogation to be admissible at trial.[10]  State v. Joseph, 109 Hawai'i 482, 493-94, 128 P.3d 795, 806-07 (2006).  It is well settled that Miranda is

> a constitutionally prescribed rule of evidence that requires the prosecution to lay a sufficient foundation--i.e., that the requisite warnings were administered and validly waived before the accused gave the statement sought to be adduced at trial--before it may adduce evidence of a defendant's custodial statements that stem from interrogation during his or her criminal trial.

State v. Ketchum, 97 Hawai'i 107, 117, 34 P.3d 1006, 1016 (2001). Thus, unless Miranda warnings are given, statements made by the accused that result from custodial interrogation, along with the fruits of such statements, "may not be used either as direct evidence in the prosecutor's case in chief or to impeach the

---

[10]    The relevant portion of article I, section 10 that embodies the Miranda requirement states that "[n]o person shall be . . . compelled in any criminal case to be a witness against oneself."  Haw. Const. art. I, § 10.

defendant's credibility during rebuttal or cross-examination."
Joseph, 109 Hawai'i at 493-94, 128 P.3d at 806-07 (quoting State v.
Santiago, 53 Haw. 254, 265-66, 492 P.2d 657, 664 (1971)); see
State v. Pebria, 85 Hawai'i 171, 174-75, 938 P.2d 1190, 1193-94
(1997).[11]

     The illegality in obtaining Statement 1 in this case is
undisputed, so two issues remain for this court's resolution: (1)
whether Statement 2 was obtained as a result of pre-Miranda
custodial interrogation and in violation of Trinque's right to
remain silent and (2) whether Statement 3 is a fruit of Statement
1, Statement 2, or both.

## A. Whether Statement 2 was obtained in violation of Trinque's right to remain silent as a result of "un-Mirandized custodial interrogation"

     Trinque argues that the circuit court correctly
suppressed Statement 2 because Lt. Rosa subjected him to custodial
interrogation prior to advising him of his Miranda rights.
Trinque contends that, while Lt. Rosa did not expressly question
him, Lt. Rosa's statements "constituted custodial interrogation as
they were designed to invoke an incriminating response."  Trinque

---

[11]  This court decreed that Miranda protections "have an independent
source in the Hawaii Constitution's privilege against self-incrimination" in
Santiago, 53 Haw. at 266, 492 P.2d at 664.  In that case, not only did this
court incorporate Miranda into the Hawai'i Constitution, the court also
broadened Miranda protections based on the Hawai'i Constitution.  See id.
(disagreeing with the U.S. Supreme Court's holding in Harris v. New York, 401
U.S. 222 (1971), and concluding that statements elicited through pre-Miranda
custodial interrogation may not be used at trial for impeachment purposes).

maintains that Lt. Rosa's statements were made for "no legitimate reason . . . other than to ingratiate himself to Trinque" and "entice him into making a statement."

Pursuant to article I, section 10 of the Hawai'i Constitution, a statement made before the defendant is apprised of his or her Miranda rights is not constitutionally elicited if it is established that the "statement was the result of (1) 'interrogation' that occurred while he or she was (2) 'in custody.'" State v. Kazanas, 138 Hawai'i 23, 35, 375 P.3d 1261, 1273 (2016) (quoting Ketchum, 97 Hawai'i at 118, 34 P.3d at 1017). In this case, there is no dispute that Trinque was in custody when Lt. Rosa elicited Statement 2 from Trinque, as Trinque was already arrested and handcuffed. See State v. Eli, 126 Hawai'i 510, 521–22, 273 P.3d 1196, 1207-08 (2012) (concluding that the defendant was deprived of his freedom in a significant way after he had been placed under arrest); accord Kazanas, 138 Hawai'i at 35, 375 P.3d at 1273; State v. Amorin, 61 Haw. 356, 360, 604 P.2d 45, 48 (1979). Thus, the decisive issue is whether Lt. Rosa's actions constituted "interrogation" under article I, section 10.

As previously explained by this court, "interrogation" encompasses "not only . . . express questioning, but also . . . any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should

15

know are reasonably likely to elicit an incriminating response from the suspect." State v. Joseph, 109 Hawai'i 482, 495, 128 P.3d 795, 808 (2006) (quoting State v. Jenkins, 1 Haw. App. 430, 437-38, 620 P.2d 263, 269 (1980)).

> The latter portion of the definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.

Id.; accord Kazanas, 138 Hawai'i at 39, 375 P.3d at 1277.

Thus, "interrogation" is "any practice reasonably likely to invoke an incriminating response without regard to objective evidence of the intent of the police." Joseph, 109 Hawai'i at 495, 128 P.3d at 808 (emphasis added).[12] "An incriminating response' refers to both inculpatory and exculpatory responses." Id. (citing State v. Wallace, 105 Hawai'i 131, 137, 94 P.3d 1275, 1281 (2004)).

There are several important considerations in this court's definition: "interrogation" under Miranda refers to (1)

---

[12] A "practice" includes any method or procedure that law enforcement officers use in the course of interacting with individuals in custody, regardless of whether such method or procedure is officially approved by the law enforcement department with which the officers are employed. See, e.g., Joseph, 109 Hawai'i at 495, 128 P.3d at 808 (pre-interview for the purpose of obtaining a statement); Kazanas, 138 Hawai'i at 40, 375 P.3d at 1278 (asking the defendant in the police department's private room in the hospital how his night was going); Eli, 126 Hawai'i at 522-23, 273 P.3d at 1208-09 (officer "asking Defendant for his side of the story and indicating that it was his chance to give that story").

any words, actions, or practice on the part of the police, not only express questioning, (2) other than those normally attendant to arrest and custody, and (3) that the police should know is reasonably likely to invoke an incriminating response.

In this case, Trinque was arrested in the late evening in an open pasture. Upon his arrest, police handcuffed Trinque, escorted him from the pasture, and then ordered him to sit on a wooden bench while still handcuffed. Lt. Rosa approached Trinque and identified himself as Lt. Rosa from the Narcotic Unit of KPD. Lt. Rosa then explained to Trinque that he was the police officer who had worked on Trinque's daughter's case. Lt. Rosa told Trinque "that if [Trinque] did not believe him, he could talk to his daughter about it." Lt. Rosa then continued with trust-building statements. He told Trinque that he would not lie to him. He advised Trinque that he "wouldn't jerk his chain." Finally, Lt. Rosa informed Trinque that "he would be completely honest" with him. Only after giving Trinque all of these personal assurances regarding his trustworthiness did Lt. Rosa tell Trinque not to make any more statements until he was taken to the police station in Līhuʻe. Trinque responded, "What for? You caught us red-handed; times are hard and we needed the money."

While Lt. Rosa's introduction of himself to Trinque as a police officer may have been normal procedure that typically attends arrests, all of the other words and actions that Lt. Rosa

directed to Trinque cannot be characterized as anything other than an attempt to erode Trinque's guard so that Trinque would freely talk in a manner that would incriminate himself. As aptly determined by the circuit court, Lt. Rosa's words and conduct had "no legitimate reason" and "were designed to garner the trust of the defendant, invite the defendant to be honest . . ., and invite the defendant to open up." By stating that he helped Trinque's daughter in a previous matter, Lt. Rosa's words may have been reasonably understood by Trinque as an offer of similar assistance or at least as an assurance that Lt. Rosa was an ally when in fact he was in an adversarial position. See Kazanas, 138 Hawai'i at 40, 375 P.3d at 1278 (reasoning that the police officer is part "of a system that was adversarial to" the defendant, such that the police officer engaging in a conversation with an arrestee "could not be 'solely in [the arrestee's] best interest'"). Couple this with Lt. Rosa's statement that he would be honest and not lie to Trinque and that he would not "jerk [Trinque's] chain" and it is readily apparent that the circuit court did not clearly err in finding that Lt. Rosa was attempting to garner Trinque's trust so that Trinque would open up.[13]

---

[13] The ICA stated that it is unclear why it would be improper for Lt. Rosa "to inform Trinque that he had worked on Trinque's daughter's case and to tell Trinque that he would not lie to Trinque and would be completely honest with Trinque" since this was simply an "apparent attempt to develop rapport with Trinque." State v. Trinque, 137 Hawai'i 130, 133, 366 P.3d 186, 189 (App.
(continued . . .)

Although Lt. Rosa testified that his intent in initiating the conversation with Trinque was merely to identify himself as a police officer, as he was unshaven and in civilian clothing, Lt. Rosa's intent is not determinative in analyzing whether his words and conduct amounted to interrogation. Joseph, 109 Hawaiʻi at 495, 128 P.3d at 808 (stating that whether an interrogation had transpired primarily focuses on the perceptions of the defendant); Kazanas, 138 Hawaiʻi at 39—40, 375 P.3d at 1277—78 (noting that a police officer's "subjective intent" may not be used to excuse conduct that reasonably could have elicited an incriminating response from the defendant).[14]

Indeed, the circuit court firmly rejected Lt. Rosa's explanation of his motive, and the court did not clearly err in this regard. Not only was that court in the best position to evaluate credibility, but the circumstances plainly contradict Lt. Rosa's explanation. Lt. Rosa was wearing a police badge, and

(. . . continued)
2016), cert. granted, No. SCWC-12-0001017, 2016 WL 3129189 (Haw. June 2, 2016). However, Lt. Rosa's repeated personal assurances to Trinque, including references to Trinque's daughter, were, as determined by the circuit court, intended to earn Trinque's trust, invited Trinque to be honest and to open up, and were reasonably likely to elicit an incriminating statement from Trinque.

[14] Intent of police officer "may be relevant where, for example, 'a police practice is designed to elicit an incriminating response from the accused,' as it would be 'unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect.'" Kazanas, 138 Hawaiʻi at 39-40, 375 P.3d at 1277-78 (quoting Rhode Island v. Innis, 446 U.S. 291, 301 n.7 (1980)). Thus, while police intent may not be used to excuse conduct that reasonably could have elicited an incriminating response, it may be used as "evidence that the police know that they have designed a practice reasonably meant to elicit incriminating responses"--that is, a practice amounting to interrogation. Id.

Trinque and Martinez were both under arrest and handcuffed. Several other officers were in the area. If Lt. Rosa's sole intention was to identify himself as a police officer, he would have had to do no more than show Trinque his badge and identify himself in order to establish his status as a police officer. If Lt. Rosa merely intended to introduce himself to Trinque, then there was no legitimate reason for him to say that he assisted Trinque's daughter in a previous matter, that he would be honest and truthful to Trinque, and that he would not "jerk [Trinque's] chain."

In addition, Lt. Rosa's statement to Trinque to not make any more statements until he was taken to the police station in Līhu'e was inaccurate--for Trinque was not required to make a statement even after he had been advised of his constitutional rights--and Trinque may have reasonably been given the impression that he might as well speak to Lt. Rosa then and there, since he would be making a statement at the station anyway. Essentially, Lt. Rosa was implicitly inviting Trinque to speak since he (Lt. Rosa) would be honest, helpful, and truthful while another police officer may or may not be. Under the circumstances of this case, where Lt. Rosa ingratiated himself to Trinque and implied that he was someone who might be able to provide some form of assistance, the wording of Lt. Rosa's flawed advisory ("to not make any more statements until he was taken to the police station") was

reasonably likely to elicit Statement 3 ("What for? You caught us red-handed; times are hard and we needed the money."). Indeed, Trinque's reply ("What for?") was directly responsive to Lt. Rosa's advisory.[15] Alternatively, Lt. Rosa's words could objectively be viewed as an attempt to establish himself as a confidante, off the record, so that when it became time to provide the Miranda warnings, Trinque would trust Lt. Rosa as someone who would not pull his chain and thus making it more likely that Trinque would waive his Miranda rights.

The State relies on State v. Ikaika, 67 Haw. 563, 698 P.2d 281 (1985), in arguing that Lt. Rosa's words and conduct were a mere pleasantry that did not amount to interrogation. The defendant in Ikaika confessed to a police officer, who was acquainted with the defendant, after the police officer asked, "What's happening? Must be heavy stuff for two detectives to bring you down here?" Id. at 565, 698 P.2d at 283. This court held that the police officer's statement was a mere "pleasantry" not amounting to interrogation and that the defendant's

---

[15] The ICA concluded that Lt. Rosa's statement was entirely appropriate, reasoning that "[i]t is difficult to see how telling a defendant not to make a statement can constitute 'interrogation.'" Trinque, 137 Hawaiʻi at 133, 366 P.3d at 189. However, Lt. Rosa's defective advisory may not be viewed in isolation; it followed a series of statements that the circuit court correctly viewed as having no legitimate reason and was designed to garner Trinque's trust so that he would open up. Viewing all of these statements in conjunction with the incorrectly stated advisory, Lt. Rosa's words and actions were reasonably likely to elicit, and did elicit, an incriminating response from Trinque.

21

"confession was of the nature of an unsolicited, spontaneous statement made in the absence of any police questioning." Id. at 567, 698 P.2d at 285. Ikaika is inapposite for the reasons enumerated in Kazanas.[16]

As explained by the Kazanas court, the police officer and the defendant in Ikaika were previously acquainted, and the police officer was unaware of the circumstances surrounding the defendant's arrest. See Kazanas, 138 Hawai'i at 38, 375 P.3d at 1276; Ikaika, 67 Haw. at 565, 698 P.2d at 283. Thus, in Ikaika, the police officer's words reasonably could be characterized and perceived by the defendant as a pleasantry not likely to elicit an incriminating response. Kazanas, 138 Hawai'i at 38, 375 P.3d at 1276; Ikaika, 67 Haw. at 567, 698 P.2d at 284-85 (reasoning that, under the facts of the case, the police officer could not "have or should [not] have reasonably foreseen that his words or actions would elicit an incriminating response from the Defendant" and that, "[a]t most, [the police officer] could have expected that the Defendant respond to his pleasantry by informing him of the reasons for the Defendant's being booked and the case he was involved in").

---

[16] The issue in Kazanas was whether the defendant, post-arrest, should have been advised of his Miranda rights before the police officer engaged him in small talk while they were inside HPD's private room at a hospital--a conversation that then resulted in the defendant's utterance of an incriminating statement. Kazanas, 138 Hawai'i at 26, 40, 375 P.3d at 1264, 1278.

In this case, as in Kazanas, Lt. Rosa and Trinque were not previously acquainted; in fact, the night of Trinque's arrest was the first time that Lt. Rosa met him.  See Kazanas, 138 Hawaiʻi at 38, 375 P.3d at 1276.  In addition, just like the police officer in Kazanas, Lt. Rosa knew the circumstances behind Trinque's arrest since he was previously briefed on the matter. See id.  Thus, when Lt. Rosa stated that he assisted Trinque's daughter on a previous case, that he would be honest and not lie to Trinque, and that he would not "jerk [Trinque's] chain," Lt. Rosa's statements deliberately ingratiated himself to Trinque and cannot be taken as "a mere pleasantry."  See id.

It is also noted that the police officer's conduct in Kazanas that this court held as constituting interrogation was less egregious than Lt. Rosa's conduct in this case.  In Kazanas, the police officer did not guarantee to the defendant that she would be honest and truthful and did not ingratiate herself to the defendant or imply that she may be able to offer some assistance for the defendant's benefit; the police officer in Kazanas solely asked a question whose answer she already knew and that, objectively viewed, was reasonably likely to evoke an incriminating response.  Id. at 26, 375 P.3d at 1264.  Here, Lt. Rosa expressly claimed that he would be honest and truthful and that he would not mislead Trinque.  And by stating that he helped Trinque's daughter in the past, Lt. Rosa at least intimated that

23

he was a friendly party, that he may be able to similarly assist Trinque, and that he should not be viewed as an adversary. See id. at 40, 375 P.3d at 1278.

In summary, Trinque was in custody when the exchange with Lt. Rosa occurred because he was handcuffed, and Lt. Rosa's words or actions were reasonably likely to elicit an incriminating response from Trinque, id., because (1) Lt. Rosa stated that Trinque could trust him, that he would not mislead Trinque, and that he would be honest; (2) Lt. Rosa intimated that he was a friendly party given that he had previously assisted Trinque's daughter in another case; (3) Lt. Rosa's ingratiating words and actions towards Trinque had no legitimate reason other than to invoke Trinque's trust and to induce him to open up; and (4) Lt. Rosa misinformed Trinque of his constitutional rights. Accordingly, Statement 2 was elicited by an unlawful, pre-Miranda custodial interrogation, and therefore, the circuit court did not clearly err in suppressing this statement pursuant to article I, section 10 of the Hawai'i Constitution. The ICA erred in concluding otherwise.[17]

---

[17] Trinque also argues that Statement 2 was a "fruit of the poisonous tree" because Trinque's statement to Officer Silva (Statement 1) was illegally obtained. The circuit court suppressed Statement 2 based on the conclusion that it was elicited through an unlawful, pre-Miranda custodial interrogation. The circuit court did not address whether Statement 2 should be suppressed as an illegal fruit of Statement 1. The ICA ruled that Statement 2 should not have been suppressed for two reasons: because it was not a product of an illegal interrogation and because it was not an illegal fruit of Statement 1.

(continued . . .)

_____

## B. Whether Statement 3 was tainted by Statements 1 and 2 under the "fruit of the poisonous tree" doctrine

Trinque argues that Statement 3 was correctly suppressed by the circuit court as a "fruit of the poisonous tree" of the unlawfully obtained statement he made to Officer Silva (Statement 1) because Statement 3 was made only a few hours after Statement 1 and there was a direct connection between Statement 1 and Statement 3. In addition, Trinque contends that Statement 3 is a fruit of Statement 2 because Statement 3 was made within hours after Statement 2 and was a direct result of Lt. Rosa's unlawful, pre-Miranda interrogation. The ICA ruled that Statement 3 was not subject to suppression as the unlawful fruit of Statement 1 or Statement 2.

"[T]he 'fruit of the poisonous tree' doctrine 'prohibits the use of evidence at trial which comes to light as a result of the exploitation of a previous illegal act of the police.'" State v. Fukusaku, 85 Hawai'i 462, 475, 946 P.2d 32, 45 (1997) (quoting State v. Medeiros, 4 Haw. App. 248, 251 n.4, 665 P.2d 181, 184 n.4 (1983)). "Under the fruit of the poisonous tree doctrine, [a]dmissibility is determined by ascertaining whether the evidence objected to as being 'fruit' was discovered or became known by the

_____

(. . . continued)
Because we conclude that Statement 2 was a product of an unlawful, pre-Miranda custodial interrogation, we need not reach the issue of whether Statement 2 is a fruit of Statement 1. However, our disposition should not be viewed as an endorsement of the ICA's resolution of this issue.

25

exploitation of the prior illegality or by other means sufficiently distinguished as to purge the later evidence of the initial taint." State v. Poaipuni, 98 Hawai'i 387, 392-93, 49 P.3d 353, 358-59 (2002) (alteration in original) (quoting Fukusaku, 85 Hawai'i at 475, 946 P.2d at 45).

> Where the government proves that the evidence was discovered through information from an independent source or where the connection between the illegal acts and the discovery of the evidence is so attenuated that the taint has been dissipated, the evidence is not a 'fruit' and, therefore, is admissible.
> . . .

Id. (quoting Fukusaku, 85 Hawai'i at 475, 946 P.2d at 45).[18]

"In other words, the ultimate question that the fruit of the poisonous tree doctrine poses is as follows: Disregarding the prior illegality, would the police nevertheless have discovered the evidence?" Id. at 393, 49 P.3d at 359. As applied to this case, the question posed is as follows: Would the police have obtained Statement 3 had they not violated Trinque's constitutional rights in obtaining Statements 1 and 2.

Accordingly, the State's burden is to demonstrate that Statement 3 is not a benefit gained or an advantage derived by the police from the prior illegality or that the subsequent statement

---

[18]    The Poaipuni court noted that, "[a]lthough we have characterized the independent source doctrine as an 'exception' to the exclusionary rule, it is, in essence, simply a corollary of the fruit of the poisonous tree doctrine." Poaipuni, 98 Hawai'i at 393 n.6, 49 P.3d at 359 n.6. That is, if a confession or other evidence has an independent source, then it is not a fruit of the poisonous tree. Id.

has become sufficiently attenuated from the initial illegality so as to purge the taint.  See State v. Eli, 126 Hawai'i 510, 524, 273 P.3d 1196, 1210 (2012) (reasoning that the State must demonstrate that the subsequent statement or confession was not predicated on the initial illegality); State v. Kitashiro, 48 Haw. 204, 218—22, 397 P.2d 558, 566—68 (1964) (holding that the State must prove that the illegal search did not "induce" the defendant's subsequent confession).

Hawai'i appellate courts have previously pronounced that whether a confession is sufficiently attenuated from the illegality depends on the facts of a particular case, and factors relevant to the analysis include (1) the temporal proximity between the official misconduct and the subsequently procured statement or evidence, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct.  See Eli, 126 Hawai'i at 524, 273 P.3d at 1210; State v. Mariano, 114 Hawai'i 271, 281, 160 P.3d 1258, 1268 (App. 2007).[19]

In determining what constitutes exploitation that taints subsequently obtained evidence, previous "fruit of the poisonous tree" cases decided by this court are instructive.  In State v. Joseph, this court held that a previous illegality was exploited

_____

[19]    See also Brown v. Illinois, 422 U.S. 590, 603-04 (1975).

to elicit a statement or confession where the defendant, post-Miranda, "was subsequently questioned on the same matter in order that he would repeat his earlier[, illegally obtained] statement." 109 Hawai'i 482, 499, 128 P.3d 795, 812 (2006). In Poaipuni, this court held that the physical evidence was inadmissible because it "came to light only as a result of the exploitation of the previous illegality, i.e., the execution of the defective search warrant." Poaipuni, 98 Hawai'i at 393, 49 P.3d at 359. As to the subsequent confession, the Poaipuni court explained that it was also tainted by the unlawfully obtained physical evidence because, had the physical evidence not been discovered, the officer would not have asked the question that resulted in the defendant's confession. Id. at 394, 49 P.3d at 360.

In Eli, this court explained that the defendant's "purported 'waiver' of his right to remain silent, made after Miranda warnings, was directly 'predicated' on his agreement, pre-Miranda, to make a statement," an agreement that he made without being apprised of his right to remain silent. Eli, 126 Hawai'i at 524, 273 P.3d at 1210. Under these circumstances, the court held that "the Mirandized statement was obtained by exploiting the illegality of the pre-interview procedure." Id. That is, the advantage derived from the improper police pre-interview procedure

played a role in the statement obtained despite the intervention of properly administered <u>Miranda</u> warnings.

The common thread that unifies these cases is that the prior illegality contributed in the subsequent obtainment of evidence, statements, or confessions. Viewed another way, these cases involved the situation in which the State failed to demonstrate that the subsequently obtained evidence, statements, or confessions would have been discovered even in the absence of the prior illegality. That is, the State was unable to meet its burden of showing that the discovery of the challenged evidence was not a benefit derived from the prior illegality.

In this case, the circuit court held that Statement 3 was an exploitation of the prior illegality of Lt. Rosa's "pre-interview" and, thus, inadmissible as evidence under "the fruit of the poisonous tree" doctrine. The circuit court concluded that the State failed to demonstrate that the statement was "sufficiently attenuated" from the illegally obtained Statements 1 and 2 to dissipate the taint of the police officers' <u>Miranda</u> violation. The circuit court cited three reasons: (1) the same officer, Lt. Rosa, remained with Trinque through the entire process; (2) Statement 3 came within hours after Lt. Rosa's "pre-interview" <u>Miranda</u> violation; and (3) Statement 3 was "in effect the same thing [Trinque] said to [Lt.] Rosa pre-<u>Miranda</u>."

The circuit court's ruling--that Statement 3 was a fruit of Statements 1 and 2--is not clearly erroneous and supported by the State's failure to introduce adequate evidence tending to demonstrate that Statement 3 would still have been obtained had the previous illegality that resulted in the utterance of Statements 1 and 2 not occurred.  The State does not discharge its burden of showing attenuation by relying on "surmise and inference."  Kitashiro, 48 Haw. at 222, 397 P.2d at 568 (explaining that evidence showing that there was "an independent origin [for] the confession was . . . necessary in order for the trial court to exercise its fact-finding prerogative in respect of the contention that the confession was tainted"); State v. Pau'u, 72 Haw. 505, 511, 824 P.2d 833, 837 (1992) (holding that "[t]he State's argument [was] not based on any evidence but is merely surmise and speculative inference," such "that the State ha[d] failed to meet its burden of showing that the taint of the prior illegal search had been dissipated or that there was an independent source which induced [the defendant] to waive his constitutional rights").  In addition, the State did not sufficiently establish an "independent origin" for Statement 3. See Kitashiro, 48 Haw. at 221-22, 397 P.2d at 567-68 (holding that the confession was a fruit of the illegal search in part because the State failed to establish by substantial evidence that the confession had an independent source).

30

The circuit court's determination that Statement 3 was not sufficiently attenuated from Statements 1 and 2 is also supported by the record and, hence, not clearly erroneous. Statement 3 was made within approximately three hours after Statements 1 and 2 and, contrary to the State's assertion, the fact that Statement 3 was made in a different location does not demonstrate sufficient attenuation. Cf. id. at 218, 397 P.2d at 566 (initial illegality and subsequent confession not sufficiently attenuated when, among other things, only three hours separated the two).

The circuit court's further determination that there were no intervening circumstances that sufficiently attenuated Statement 3 from Statements 1 and 2 so as to purge the taint is also not clearly erroneous. As stated by the court, Lt. Rosa, who unlawfully elicited Statement 2 from Trinque, was with Trinque while he was transported to Līhuʻe. Additionally, Lt. Rosa and Officer Silva, the latter of whom was involved in the illegal procurement of Statement 1, were both present during the advisement of Miranda rights that resulted in Trinque uttering Statement 3. Cf. Joseph, 109 Hawaiʻi at 499, 128 P.3d at 812 (holding that there was lack of attenuation between the illegal pre-interview and the post-interview partly because the post-interview "was conducted by the same two detectives in the same interrogation room with no lapse in time between it and the pre-

interview"); Eli, 126 Hawai'i at 524-25, 273 P.3d at 1210-11 (holding that there was lack of attenuation because "[b]oth the pre-interview and post-Miranda interview were conducted by the same detective"). Given that Officer Silva was present when Trinque uttered Statement 1, and because Lt. Rosa was the officer who procured Statement 2, Trinque was not in a neutral position to contradict or recant these earlier statements. See Kitashiro, 48 Haw. at 218, 397 P.2d at 566 (explaining that the police used illegally seized evidence "to instill in defendant a realization of the hopelessness of his situation"); cf. Pau'u, 72 Haw. at 510, 824 P.2d at 836 (reasoning that the defendant had no choice but to confess because the police already had the evidence to convict him after illegally searching the defendant's bag and that, therefore, the confession was a fruit of the illegal search).[20] Also notable is the fact that Statement 3 was made without the benefit of counsel or after Trinque had an opportunity to speak with family or friends. See Medeiros, 4 Haw. App. at 252-53, 665 P.2d at 184-

---

[20] The State contends that the hopelessness that Trinque felt, which led to Statement 3, was the result of his being caught by the police officers in the marijuana patch and not at all related to the illegal conduct of Lt. Rosa and Officer Silva. However, this assertion as to the source of any hopelessness appears to be based on supposition. The circuit court rejected the State's contentions concerning sufficient attenuation of Statement 3 from the taint of Statements 1 and 2, and, based on the evidence in the record, that finding is not clearly erroneous. Cf. Pau'u, 72 Haw. at 511, 824 P.2d at 837 (holding that arguments regarding the sufficient attenuation to dissipate the taint of a prior illegality must be supported by evidence).

85 (noting that the opportunity to speak with counsel or family or friends is a relevant consideration in determining taint).

Contrary to the ICA's reasoning and the State's argument, the fact that Statements 1 and 2 were not referenced when Statement 3 was elicited is not sufficient to discharge the State's burden of demonstrating that Statement 3 was not a benefit gained by the police from Statements 1 or 2. Although this court has held that express invocation of the product of an initial illegality in order to elicit a subsequent incriminating statement is sufficient to show that the subsequent statement is tainted, see, e.g., Eli, 126 Hawai'i at 524, 273 P.3d at 1210, the fact that no reference is made to the product of the initial illegality does not establish that the subsequent statement is not tainted.[21] If non-reference were sufficient to disprove taint, police officers could violate with impunity a defendant's constitutional rights to obtain a confession. For example, after obtaining a confession during a pre-Miranda custodial interrogation, police officers could apprise the defendant of his or her constitutional rights and then refrain from mentioning the previous confession so that all post-Miranda statements can be freely admitted into evidence.

_____

[21] Further, as explained supra, Eli, Joseph, and Poaipuni essentially were cases in which the State failed to meet its burden of proving that the prior illegality did not contribute to the subsequent discovery of the challenged evidence. Those cases do not stand for the proposition that explicit reliance by the police on the prior illegality is a prerequisite to finding that the subsequently obtained evidence is a fruit of the poisonous tree.

This outcome would render superfluous the fundamental guarantees of Miranda by the simple artifice of not mentioning the earlier, illegally obtained statement when eliciting the subsequent statement.

While it is true that Statement 3 was elicited during Officer Silva's advisement of Trinque's Miranda rights, Miranda warnings, by themselves, are not enough to attenuate the taint of a prior illegality. Mariano, 114 Hawai'i at 281, 160 P.3d at 1268. If "Miranda warnings . . . were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted." Id. (quoting Brown, 422 U.S. at 602); Joseph, 109 Hawai'i at 487, 499, 128 P.3d at 800, 812 (subsequent statement, made post-Miranda, was held to be a fruit of the poisonous tree); Eli, 126 Hawai'i at 524, 273 P.3d at 1210 (accord). Viewed another way, if Miranda warnings were sufficient to attenuate the taint of a prior illegality, then the warnings-- which were designed to safeguard certain constitutional rights-- would become a means to legitimize the violation of such rights.

The State further contends that State v. Luton, 83 Hawai'i 443, 927 P.2d 844 (1996), is controlling. In that case, this court held that the defendant's subsequent confession was not the fruit of his pre-Miranda statements because the police

officers did not exploit an illegally obtained statement to elicit the defendant's subsequent confession.[22] <u>Luton</u>, 83 Hawai'i at 455, 927 P.2d at 856. However, <u>Luton</u> is entirely distinguishable from this case. First, the illegal statement and the post-<u>Miranda</u> statement in <u>Luton</u> were made one day apart, in contrast to a few hours in this case. See <u>id.</u> at 447, 927 P.2d at 848. Second, in <u>Luton</u>, the officers who elicited the post-<u>Miranda</u> confession were different from the one who obtained the illegal pre-<u>Miranda</u> statement. <u>Id.</u> Here, on the other hand, the same police officers involved in illegally obtaining Statement 1 and Statement 2 were present in the interrogation room when Statement 3 was made, and Officer Silva was the one who was advising Trinque of his constitutional rights when Statement 3 was made. Third, and most significantly, the defendant in <u>Luton</u> met with a public defender, between the taking of the unlawful statement and the subsequent statement, and the public defender "advised [Luton] not to say anything to anyone, including the police." <u>Id.</u> Nevertheless, the defendant elected to speak to the police. <u>Id.</u> at 446, 927 P.2d at 847. <u>Luton</u> thus involved intervening circumstances--not present

---

[22] <u>Luton</u> also noted the fact that the police did not use the pre-<u>Miranda</u> statements to induce a confession and did not reference the pre-<u>Miranda</u> statements during the post-<u>Miranda</u> interrogation. <u>Luton</u>, 83 Hawai'i at 455, 927 P.2d at 856. As discussed <u>supra</u>, the fact that the police in this case did not mention or reference Statements 1 and 2 when Trinque made Statement 3 and that <u>Miranda</u> warnings were provided before Statement 3 was made does not suffice to satisfy the State's burden of proving that Statement 3 is not a fruit of Statements 1 and 2.

in this case--that purged the taint. In light of these facts, Luton is inapposite.

Accordingly, pursuant to article I, section 10 of the Hawai'i Constitution, the State failed to meet its burden of demonstrating that Statements 1 and 2 did not taint Statement 3 or that Statement 3 was so attenuated from Statements 1 and 2 as to purge the taint for the following reasons: (1) the State failed to show that Statement 3 would still have been elicited had the illegality that produced Statements 1 and 2 not occurred; (2) the fact that neither Statement 1 nor Statement 2 was explicitly referenced in the course of eliciting Statement 3 does not satisfy the State's burden of demonstrating that Statement 3 is untainted; (3) there were no intervening circumstances to indicate that the taint of Statements 1 and 2 had dissipated when Statement 3 was made; (4) the lapse of time and change in location are inadequate to demonstrate sufficient attenuation between Statements 1 and 2 and Statement 3; and (5) under the circumstances of this case, advising Trinque of his constitutional rights did not attenuate Statement 3 from the prior illegality in obtaining Statements 1 and 2. Thus, Statement 3 was the fruit of Statements 1 and 2 and inadmissible into evidence.

## V. CONCLUSION

We hold that Statement 2 is inadmissible into evidence because it was the product of pre-Miranda custodial interrogation

and that Statement 3 is the fruit of Statements 1 and 2. Accordingly, the circuit court's rulings as to Statements 2 and 3 were not clearly erroneous. For these reasons, we vacate the ICA's Judgment on Appeal; affirm the circuit court's Order Suppressing Statements and Order Denying Voluntariness of Statements; and remand this case to the circuit court for further proceedings.

| | |
|---|---|
| Jon N. Ikenaga and Hayley Y.C. Cheng for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Sabrina S. McKenna |
| Justin F. Kollar and Tracy Murakami for respondent | /s/ Richard W. Pollack |
| | /s/ Michael D. Wilson |
| | /s/ Gary W.B. Chang |

